STATE OF NEBRASKA, APPELLEE, V. STANLEY PRESCOTT RUYLE,
APPELLANT.

452 N.W.2d 734

Filed March 16, 1990.    No. 88-1053.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The defendant, Stanley Prescott Ruyle, was convicted of first degree felony murder pursuant to Neb. Rev. Stat. § 28-303(2) (Reissue 1989) in the arson death of Robert D. Scott on August 5, 1987, and was sentenced to life imprisonment. He has appealed and contends the district court erred (1) in allowing the State to offer evidence of his statements to Lincoln Police Officers Burkhart, McAndrew, and Ashley and to Scott Buck; (2) in allowing the State to offer evidence regarding several acts of uncharged misconduct; and (3) in failing to properly instruct the jury.

The fire that resulted in the charges against the defendant occurred in the early morning hours of August 5, 1987. The fire, which was fueled by an accelerant, was started on the back porch of an apartment rented by Scott Buck, the defendant's companion, located at 1445½ D Street in Lincoln. Apparently, the setting of the fire was directed at Buck. The victim, Robert Scott, lived in another apartment in the building and died of smoke inhalation and carbon monoxide poisoning as a result of the fire.

Prior to trial, the defendant filed a motion in limine seeking to prevent the State from presenting evidence regarding statements made by him to several Lincoln police officers and to Scott Buck. In a second motion in limine, the defendant sought to exclude evidence of numerous acts of the defendant's uncharged misconduct.

The trial court's rulings on the defendant's motions in limine are not in the record. During the trial, however, the defendant renewed his objections to admission of the evidence regarding his statements and acts. In each instance, the trial court granted the defendant a continuing objection on the grounds stated in the motions in limine. The court then overruled the defendant's objections and allowed the State to introduce evidence regarding the statements and acts of the defendant. The court also conducted a hearing outside the presence of the jury and determined that the defendant's various statements to law enforcement officers were voluntarily made. The defendant has not appealed the court's findings in this regard.

Four witnesses testified, over objection, to statements the

defendant had made before the fire. In three instances, the defendant specifically threatened to burn or torch Scott Buck's apartment building, which is where the fire occurred. In the fourth statement, the defendant considered getting a gun and shooting Buck. Most of the statements were made after there had been an altercation between the defendant and Buck. Testimony regarding the defendant's past conduct, which included acts of assault, vandalism, theft, and trespassing, also was admitted at trial.

## I. Defendant's Statements.

In his motion in limine filed September 8, 1988, the defendant sought to prohibit the State from presenting evidence regarding his statements to several Lincoln police officers, including Officers Burkhart, McAndrew, and Ashley, and "[s]tatements related by Scott Buck in his deposition of August 4, 1988." The deposition of Buck is not in the record. In his motion, the defendant claimed that the statements were irrelevant or, in the alternative, that their probative value was outweighed by the prejudicial effects of the statements.

In his brief, the defendant has specified the testimony complained of and contends that his prior statements were inadmissible under Neb. Evid. R. 401, 402, and 403 (Neb. Rev. Stat. §§ 27-401, 27-402, and 27-403 (Reissue 1989)).

The record shows that Scott Buck, the tenant at 1445½ D Street, first met the defendant during May 1987. Buck and the defendant became involved in a homosexual relationship and had a number of arguments over sex. Buck testified that during these fights, the defendant threatened at least three times to burn down Buck's apartment.

Lincoln Police Officer James Ashley testified that he had been dispatched to 1445½ D Street in the early morning hours of July 16, 1987. During that incident, the defendant refused to leave Scott Buck's apartment at 1445½ D Street. After Ashley advised the defendant that he would have to leave or he would be arrested for trespassing, the defendant lost control of himself and began yelling and screaming and waving his hands about wildly. The defendant then ran from the apartment into the hallway, kicking the doors to other apartments, beating on

the other apartment doors with his fists, and continuing to yell and scream.

Ashley subsequently placed the defendant under arrest for disturbing the peace. Ashley testified that while he was attempting to arrest the defendant, the defendant turned his head, apparently back toward 1445$\frac{1}{2}$ D Street, and yelled that he "would be back and he would burn that fucking house down." Ashley further testified that once inside the police cruiser, the defendant "began saying that he wanted some more, he wanted some more." Then the defendant said, "I can't wait until I get out. I'm going to come back and burn that building down." The defendant continued to kick the cage in the cruiser and said that he wanted Ashley to pull his gun and shoot him, that "I can't wait till the day comes . . . that I can blow your fucking head off," and that Ashley should get at least 15 other officers at the jail because there was going to be a fight.

Lincoln Police Officer Burdette Burkhart testified that he contacted the defendant early in the afternoon of July 16, 1987, regarding an incident of vandalism to an automobile located behind the apartment at 1445$\frac{1}{2}$ D Street. During their conversation, the defendant became irate and began to "cuss and swear." Burkhart testified that the defendant

> made the statement that he was going to torch or burn the house. I asked him, how do you intend to do that, and he indicated with gasoline. I then asked him, I said, I don't think you should be telling me those things, you shouldn't be making comments such as that to a police officer.

The defendant then calmed down and left after receiving a citation.

Officer Burkhart testified that he contacted the defendant a short time later on the afternoon of July 16, 1987, in response to a trespassing complaint involving another residence. While Burkhart and the defendant were standing directly across the street from 1445$\frac{1}{2}$ D Street and Burkhart was issuing the defendant a citation for trespassing, the defendant again became irate "and again he stated that he was going to torch or burn the house." Burkhart further testified that he had a "pretty good idea" about which house the defendant was

talking about and that he told the defendant not to make statements like that because it could get him into trouble.

The final testimony complained of concerning the defendant's statements was given by Lincoln Police Officer Kirk McAndrew. McAndrew testified that at approximately 11 p.m. on August 3, 1987, he responded to a report of a fight between Buck and the defendant at the 7-Eleven store at 13th and E Streets. McAndrew arrested the defendant and transported him to the jail. Inside the jail, McAndrew put his gun in the gun locker. At this time, McAndrew testified, the defendant made a statement "to the effect that he should buy a gun and shoot Scott." McAndrew responded by saying that if the defendant did something like that, he would be arrested. McAndrew testified that the defendant paused for a few minutes and said that "he should buy a gun and shoot Scott. He put it in the form of a question. Maybe I should buy a gun and shoot Scott."

The defendant contends that the evidence regarding his statements to Buck, Ashley, Burkhart, and McAndrew was irrelevant or, in the alternative, that the probative value was outweighed by the prejudicial effects of the statements.

There is some evidence in the record to the effect that the defendant may be mentally retarded. He argues in his brief that he "is a person of limited intelligence who made threats and threw tantrums all the time" and that, given his character, statements which were made more than 2 weeks before the fire were too remote in time, and too remote in the sequence of incidents between the defendant and Scott Buck, to bear any connection to the fire which occurred on August 5, 1987. The defendant further argues that although his August 3, 1987, statement to Officer McAndrew that "[m]aybe I should buy a gun and shoot Scott" was close in time to the fire, the statement was irrelevant because it bore no relationship to the fire.

Under rule 402, only relevant evidence is admissible, and irrelevant evidence is not admissible. *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985). Rule 401 provides that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." Relevant evidence may be excluded pursuant to rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

This court has recognized that evidence of prior acts or statements showing a dispute between the defendant and a victim may be admissible on the issue of intent.

In *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988), the defendant was convicted of manslaughter and using a deadly weapon to commit a felony. He claimed on appeal that evidence regarding an altercation between the defendant and the victim that occurred more than 1 year prior to the victim's death was too remote in time to be relevant and was admitted in violation of Neb. Rev. Stat. § 27-404(2) (Reissue 1989). In rejecting the defendant's contentions, this court stated:

> Unlike the situation recently presented in *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988), where the evidence of other wrongs concerned events which bore no relationship to the crimes charged, the evidence in question in the present case tends to show Rincker was involved in a long-running dispute with the victim and thus bears on the question of intent, which, because Rincker was charged with first degree murder, was an issue. Therefore, the questioned evidence was relevant.

*Rincker, supra* at 529, 423 N.W.2d at 439-40.

In *State v. Craig*, 219 Neb. 70, 361 N.W.2d 206 (1985), the defendant was convicted of first degree sexual assault of a child in connection with an incident which occurred Christmas morning, 1981. The State presented evidence of numerous prior incidents involving the defendant's sexual misconduct toward the 13-year-old victim. In explaining the purpose and relevancy of the challenged evidence, this court stated:

> We intuitively conclude (1) incidents such as the subject of prosecution in this case do not frequently happen in Nebraska households, and (2) society still rejects and disbelieves such incidents as commonplace occurrences. Consequently, separated from the past, the victim's

account of the incident in this case would appear unbelievable. If the Christmas incident were examined as an isolated episode unconnected with any background or antecedent events, incredibility engendered by the very improbability of the episode would cause the mind to boggle and recoil in disbelief. "[E]xhibited alone, many real occurrences would appear under the guise of falsehood, and truth itself would be made to lie." [Citations omitted.]

When all antecedent acts and events preceding the Christmas incident are considered collectively, reasonable deduction compels probability of Craig's commission of the crime charged.

*Craig, supra* at 75-76, 361 N.W.2d at 212.

In *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986), the defendant was convicted of the first degree murder of his wife. During the trial, the court allowed a former wife of the defendant to testify about his attempt to choke her during an argument which occurred nearly 10 years prior to the murder. On appeal, the defendant argued that this evidence was so remote in time and dissimilar in circumstances as to be inadmissible. In rejecting his contentions, this court noted that

the admissibility of evidence concerning other conduct must be determined upon the facts of each case and that no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is remote. The question of remoteness in time is largely in the sound discretion of the trial court; while remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence. As is generally true on questions concerning the admissibility of evidence, the question of whether other conduct is sufficiently similar to the offense charged is also a matter left largely to the sound discretion of the trial court.

*Kern, supra* at 185-86, 397 N.W.2d at 29.

The defendant further contends that even if the evidence of his statements was relevant, the testimony was "merely inflammatory," had the effect of unfairly prejudicing the jury,

and should have been excluded pursuant to rule 403.

In *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987), the defendant was convicted of second degree murder and use of a weapon to commit a felony in the shooting death of his son. In that case, the State presented evidence regarding the defendant's participation in the robbery of a Florida drug dealer in order to explain the defendant's motive for shooting his son. The defendant claimed on appeal that testimony regarding the Florida robbery was unfairly prejudicial because it showed the defendant was involved in drugs and a robbery. In examining the relevancy and the prejudicial effect of the evidence, this court said:

> As noted in *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984), most evidence offered by one party to an action is intended to be prejudicial to the opposing party; it is only unfair prejudice with which § 27-403 is concerned. According to *Lincoln Grain, supra* at 439, 345 N.W.2d at 306, "In the context of § 27-403 such prejudice means a tendency to suggest a decision on an improper basis."
>
> Probative value, on the other hand, "is a relative concept and involves a measurement of the degree to which the evidence persuades the trier of fact that a particular fact exists and the distance of that particular fact from the ultimate issue in the case." *State v. Clancy,* [224 Neb. 492, 498, 398 N.W.2d 710, 715 (1987)].
>
> The ultimate issue in this case was the defendant's guilt or innocence of the crimes charged. Proof of motive was critical to the State's case under the circumstances of the shooting. . . .
>
> Motive is defined as that "which leads or tempts the mind to indulge in a criminal act." *State v. Coca*, 216 Neb. 76, 82, 341 N.W.2d 606, 610 (1983).

*Wilson, supra* at 471-72, 406 N.W.2d at 127. We concluded in *Wilson* that without evidence of the circumstances leading to the dispute between the victim and the defendant regarding the money obtained in the Florida robbery, there would have been no apparent motive for the defendant to have shot his son.

Generally, it is within the trial court's discretion to admit or

exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Wilson, supra*; *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988). The material facts in this case included (1) the identity of the person who set the fire, (2) that the fire was intentionally set and was not an accident, and (3) the motive for setting the fire. Although the victim of the fire was Robert Scott, the record shows that the defendant's action in setting the fire was directed at Scott Buck, who lived in the same building as the victim. The defendant's threats to burn or "torch" Buck's residence were relevant to the issues of identity and intent, and to show that the fire was not an accident. The defendant's statement about getting a gun and shooting Buck demonstrated the continuing dispute between the defendant and Buck and explains both the defendant's motive and the facts surrounding the fire. The trial court did not abuse its discretion in admitting evidence of the defendant's prior statements. His claims to the contrary are without merit.

## II. Prior Acts.

In his second assignment of error, the defendant claims the trial court erred in allowing the State to offer evidence of several acts of uncharged misconduct, including the July 16, 1987, arrest of the defendant by Officer Ashley for disturbing the peace; the July 16, 1987, vandalism of an automobile; the July 16, 1987, trespass at 1600 C Street; the July 16, 1987, theft from Scott Buck; the August 3, 1987, assault of Buck; and defendant's arrest for disturbing the peace on August 4, 1987. He claims that this evidence was offered to show that the defendant "was an ill behaved person and not because any of the acts bore any logical relevance to the crime charged." Brief for appellant at 14. He also claims that the evidence was highly inflammatory and prejudicial to his right to a fair trial.

Officer Ashley's testimony regarding the defendant's arrest at Buck's residence for disturbing the peace in the early morning hours of July 16, 1987, has been discussed above. Buck also testified to the details of this incident.

Regarding the acts of vandalism, trespassing, and theft on July 16, 1987, Officer Burkhart testified that at about 1:10 p.m. he received a complaint from Buck's next door neighbor, Lee

Jones, about some traffic violations committed by the defendant. Burkhart stopped the defendant's car and said he wanted to talk to him about some vandalism to a car parked behind 1435 D Street, in which a radio had been thrown through the windshield. The defendant admitted to Burkhart that he was the one responsible for throwing the radio and said he was trying to throw it against the house at 1445 D Street, but missed and hit the parked car instead. Burkhart then issued the defendant a citation for vandalism. It was at this point that the defendant became irate and said he would burn the house with gasoline, as discussed above.

At about 1:20 p.m., Burkhart investigated a complaint that the defendant was trespassing at 1600 C Street. Burkhart did not see the defendant at that address, but observed a broken television in the hallway on the first floor of the building. He advised the police dispatcher that he "wanted a locate for all officers put out on Stanley Ruyle" regarding the incident at 1600 C Street. A short time later, Officer Dennis Duckworth advised Burkhart that he had stopped the defendant at 15th and D Streets. Burkhart returned to 15th and D and saw Duckworth and the defendant standing near the defendant's car.

Duckworth testified that as he was patrolling in the area of 15th and D, he became aware of Burkhart's dispatch. Duckworth saw the defendant's car turn into the alley behind 1445 D Street, followed the defendant's car, and saw the defendant throw some items out of the car toward the house. Duckworth stopped the defendant and asked him what was going on. The defendant said he was throwing items back that he had stolen from Buck. The defendant also told Duckworth he had items in his car that he had stolen from Buck.

Burkhart remained with the defendant's car while Duckworth and the defendant went to the alley to retrieve the items thrown from the car which belonged to Buck. The defendant then gave consent for the officers to search his car. As Duckworth searched the car, Buck arrived and identified several items found in the trunk of the defendant's car as belonging to him. Buck testified that the defendant had stolen the items because Buck would not give him sex. The defendant was handcuffed and placed under arrest for the trespassing

incident.

Buck testified that by August 3, he had moved in with the defendant but had not given up his own apartment. After he and the defendant quarreled about sex on the night of August 3, Buck went to his own apartment to be alone. When he left his apartment, Buck encountered the defendant, who knocked Buck to the ground and began pounding on his chest. Buck went to the 7-Eleven store to call the police, with the defendant "consistently tr[ying] to chase me around in his car, screaming and yelling up [sic] the top of his lungs."

Officer McAndrew testified that he was dispatched to the 7-Eleven store at 13th and E Streets at 11 p.m. on August 3, 1987, to investigate a disturbance. Buck told McAndrew that there had been an incident earlier in the evening, and Buck exhibited injuries to his chest and left leg. The defendant told the officer that he and Buck had argued about sex earlier in the evening and that the argument had continued to the 7-Eleven. McAndrew arrested the defendant for domestic assault and transported him to the jail. It was after this incident that the defendant told McAndrew that maybe he should buy a gun and shoot Buck.

Apparently, the defendant was released on bond from jail early on the morning of August 4. At approximately 6 a.m., Officer McAndrew contacted the defendant at 13th and E Streets because he had received a report of a disturbance near Scott Buck's residence. The defendant was then driving his 1973 Plymouth automobile. McAndrew arrested the defendant for disturbing the peace and placed him in the cruiser.

Neb. Evid. R. 404(2) (Neb. Rev. Stat. § 27-404(2) (Reissue 1989)), provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court has held that rule 404(2)

> is an inclusionary rule permitting the use of relevant evidence of other crimes, wrongs, or acts for purposes

other than to prove the character of a person in order to show that such person acted in conformity with that character. Thus, § 27-404(2) permits evidence of other crimes, wrongs, or acts if such is relevant for a purpose other than to show defendant's propensity or disposition to commit the crime charged. *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986). In applying § 27-404(2) we have said that evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question. *State v. Kern, supra.* *State v. Rincker*, 228 Neb. 522, 529, 423 N.W.2d 434, 439 (1988). See, also, *State v. Donhauser*, 231 Neb. 114, 435 N.W.2d 186 (1989).

"Evidence of other criminal acts which involve or explain the circumstances of the crime charged, or are integral parts of an overall occurrence or transaction, may be admissible." *State v. Nielsen*, 203 Neb. 847, 851-52, 280 N.W.2d 904, 907 (1979). See, also, *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

The fire which resulted in the death of Robert Scott was set on the back porch of Scott Buck's apartment. Evidence of the long-running dispute between Buck and the defendant explained the circumstances of the crimes charged and was an integral part of the overall occurrence or transaction. This testimony tended to identify the defendant as the person who started the fire, to show that the fire was intentionally set, and to explain the defendant's motive for doing so. Under the circumstances, the trial court did not abuse its discretion in admitting evidence of the defendant's prior acts. The defendant's assignment of error is without merit.

### III. Jury Instructions.

In his final assignments of error, the defendant complains that the trial court erred in refusing to give the defendant's proposed jury instruction No. 1 and in overruling defendant's objection to jury instruction No. 4 regarding the elements of the

crime of first degree murder.

The record does not show that the defendant objected to jury instruction No. 4. At the instruction conference, defense counsel offered his proposed jury instructions Nos. 1 and 2. Counsel then noted that the court's instruction No. 4 was essentially the same as the defendant's proposed instruction No. 2, "so in that regard, I would not have an objection to Instruction No. 4." The defendant's proposed jury instruction No. 2 is not in the record. The situation is similar to that in *State v. Byrd*, 231 Neb. 231, 235, 435 N.W.2d 898, 901 (1989), where the court noted: "Defendant's proposed instruction No. 3 [regarding entrapment] was nearly identical to NJI 14.34, which was given by the court, and was submitted by the defendant as an alternative to his proposed instructions Nos. 1 and 2."

The jury was instructed, pursuant to instruction No. 4:

Under Count I of the information in this case, depending on the evidence, you may find the defendant:

a. Guilty of murder in the first degree; or

b. Not guilty.

The material elements which the state must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of murder in the first degree are:

1. That the defendant, Stanley Prescott Ruyle, killed Robert D. Scott.

2. That the defendant did so while in the perpetraion [sic] of an arson of 1445 1/2 "D" Street.

3. That the perpetration of said arson consisted of each and every one of the following elements:

a. That the defendant, Stanley Prescott Ruyle, damaged a building by starting a fire or causing an explosion.

b. That the defendant did so intentionally.

c. That the defendant did so knowing at the time that another person was present therein or that the circumstances were such as to render the presence of another person therein a reasonable probability.

d. That the defendant did so on or about August 5,

1987, in Lancaster County, Nebraska.

Defendant's proposed instruction No. 1 provided, in part:

Under Count [I] of the information in this case, depending on the evidence, you may find the defendant:

a. Guilty of first degree murder or

b. Guilty of second degree murder or

c. Guilty of manslaughter, or

d. Not guilty.

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of first degree murder are:

1. That the defendant, Stanley Prescott Ruyle;

2. Did on or about the 5th day of August, 1987;

3. Did kill Robert D. Scott;

4. While in the perpetration of:

a. Intentionally damaging a building by starting a fire;

b. When another person was present in the building at the time and he knew that fact, or the circumstances were such as to render the presence of a person therein a reasonable probability; and

c. That said building was located at 1445 1/2 "D" Street, Lincoln, Lancaster County, Nebraska;

*5. That said fire was the proximate cause of the death of Robert D. Scott.*

(Emphasis supplied.)

The defendant's proposed instruction No. 1 was inappropriate under *State v. Hubbard*, 211 Neb. 531, 534, 319 N.W.2d 116, 118 (1982):

Where an information charges a defendant with a killing committed in the perpetration of or attempt to perpetrate one of the specific felonies set out in § 28-303(2), second degree murder and manslaughter are not lesser-included offenses, and it is ordinarily error for the trial court to instruct the jury that it may find the defendant guilty of second degree murder or manslaughter, even though such an instruction is requested.

See, also, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984); *State v. Massey*, 218 Neb. 492, 357 N.W.2d 181 (1984).

In his brief, the defendant concedes there was evidence that the defendant started the fire which was the proximate cause of Robert Scott's death, but claims also there was evidence that Scott safely fled his burning apartment and then returned to the apartment. The defendant argues that he was, therefore, entitled to an instruction that the jury must find beyond a reasonable doubt that the arson was the proximate cause of Scott's death. The defendant then claims that although his proposed instruction No. 1 did not adequately set forth the law on proximate cause,

> the defendant's proposed jury instruction sufficiently advised the trial court that defendant was requesting an instruction on proximate cause. Because the defendant was entitled to an instruction on proximate cause and requested an instruction on proximate cause, it was the duty of the trial court to correctly instruct the jury on proximate cause.

Brief for appellant at 21.

In *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989), we said that all jury instructions, read conjunctively, must correctly state the law, adequately state the issues, and not mislead the jury. The trial court, whether requested or not, must instruct the jury on the law of the case. *Id.*

The defendant claims that the instruction which should have been given is that set forth in *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975). In that case, the defendant was convicted of felony murder for the death of an elderly woman in the perpetration of a robbery, and defendant claimed on appeal that the victim's death was caused by improper medical treatment. The jury was instructed as follows:

> "You are instructed that to constitute a homicide committed while perpetrating or attempting to perpetrate a robbery there must be, in addition to the death of a human being, a robbery or an attempted robbery which proximately caused that death.
>
> "The proximate cause of a death is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause produces the death, and without which the result would not have occurred. It is the

efficient cause, the one that necessarily sets in operation the factors that accomplish the death.

"This does not mean that the law seeks and recognizes only one proximate cause of a death, consisting of only one factor, one act, one element or circumstance, or the conduct of only one person. To the contrary, the acts of two or more persons may work concurrently as the efficient cause of a death, and in such a case, each of the participating acts is regarded in law as a proximate cause.

"An 'efficient intervening cause' is a new and independent act, itself a proximate cause of the death, which breaks the causal connection between the original illegal act and the death."

*Harris, supra* at 80-81, 230 N.W.2d at 207.

The defendant's theory of the case is that the victim, Robert Scott, caused his own death by voluntarily reentering his apartment after he was safe. Under this theory, he argues, the jury could find that the act of the victim in returning to the burning building after he had successfully fled to safety was an efficient intervening cause which broke the causal connection between the original illegal act and the death of the victim.

The defendant has not cited any portion of the record which shows that the victim "got to safety and then chose to go back into his apartment," brief for appellant at 23, and there is no evidence to sustain that theory. Our review of the record satisfies us that there is no evidence to support such a claim.

There is evidence that the victim called 911 to report the fire, and the victim was found, either dead or unconscious, in his apartment with his pet cat underneath his right arm. Dr. Daniel Till testified that the victim died of smoke inhalation and carbon monoxide poisoning. He further testified that carbon monoxide poisoning may cause a gradual deterioration of one's ability to function. Dr. Till stated that carbon monoxide poisoning may cause difficulty in maintaining balance and orientation, that one's judgment may become seriously altered, and that a person may have difficulty staying mobile and lose his sense of direction due to carbon monoxide poisoning.

The only testimony which might suggest that the victim ever left his apartment, however, was given by Thomas Schutz, a

resident of the apartment building:

Q. What's the next thing you remember with regard to that evening?

A. The next thing I remember, someone was knocking, pounding on my door, yelling, "Fire, fire." At that point I thought maybe it was a practical joke. I'm a fairly heavy sleeper. I got up. You know when somebody yells, "Fire, fire," you probably — you at least should investigate, so I did and —

Q. Do you know who that was that hollered, "Fire, fire"?

A. I thought it was Bob Scott at that point.

Q. Why did you think it was Bob Scott?

A. Well, because I heard him yell — after that I heard him say, yes, I know. I heard him talking and I heard him scream and fall.

Q. Okay. But at this precise time, you aren't sure who it was —

A. No.

Q. — would that be a fair statement?

A. Yes, it would be.

Schutz further testified that after he heard the pounding on his door, he dressed and tried to make a telephone call. It was at this time that Schutz heard a "wild maniacal sort of a scream and then a big thud . . . like somebody falling." These sounds came from the victim's apartment.

On cross-examination, Schutz testified:

Q. And you were awakened by a pounding, is that right?

A. And someone yelling, "Fire."

Q. Okay. So you actually recall hearing, "Fire"?

A. Yes.

Q. Did you recognize the voice at that time?

A. At that time, it sounded like Bob Scott because I heard his voice shortly after that, too.

Q. Okay. So in your mind, you thought it was Bob Scott.

A. Yes.

Q. Is that right?

A. Yes.

Q. And you've indicated also that you had heard a scream.

A. Yes.

Q. Is that right? And a thud?

A. Someone falling.

Q. Is that right? Did you hear anything else?

A. The night of the fire. There was a — after someone yelled the, "Fire, fire," there was a knocking on the door, I heard someone say, "Yeah, I know —

Q. Okay.

A. — there's a fire." Now, I don't know whether that was Marlon Pals in the room in the apartment east of me or if it was Bob.

Scott Buck testified that the first thing he did as he left his apartment after discovering the fire was to knock on Schutz' door because Schutz was a sound sleeper. Buck spoke in a very loud voice, telling Schutz to get out because "the place is going down."

Lee Jones testified that he saw the victim looking for his cat in the alley on August 4 at 11 p.m., but that Robert Scott was "noticeably absent" from the crowd of people watching the fire.

No witness testified to seeing the victim alive outside the apartment building after the fire started.

Since there is no evidence that the victim ever "got to safety and then chose to go back into his apartment," creating an alleged efficient intervening cause of death, the defendant's claims amount to no more than an assertion that the victim was negligent in failing to prevent his own death. A victim's contributory negligence, however, is not a defense to homicide.

For example, in *State v. Leech*, 54 Wash. App. 597, 775 P.2d 463 (1989), *review granted* 113 Wash. 2d 1027, 784 P.2d 531, the defendant was convicted of first degree felony murder stemming from an arson fire. He appealed, contending that the victim firefighter's own negligence in failing to use his breathing apparatus, rather than the arson, caused the victim's death. The Court of Appeals of Washington found that the facts of the case amply supported a finding that the defendant's arson fire

proximately caused the victim's death.

> "[I]t is not necessary that defendant's act should have been the sole cause of the harm[;] . . . a contributory cause is sufficient." (Italics omitted.) [Citations omitted.] Here, the arson was *at least* a contributory cause of Earhart's death. But for the arson fire, Earhart would not have been exposed to the poisonous fumes that ultimately killed him.
>
> Moreover, a victim's contributory negligence does not relieve a defendant of criminal responsibility for homicide unless it is a supervening cause of death, that is, the *sole* cause of death. *State v. Judge*, 100 Wash.2d 706, 718, 675 P.2d 219 (1984) . . . . Earhart's alleged negligence in failing to use his breathing apparatus properly did not intervene in the chain of causation in such a way as to become the sole cause of his death. Earhart's failure to use his breathing apparatus would not have resulted in his death if Leech had not set the arson fire. Thus, Leech's conduct in setting the fire proximately caused Earhart's death.

(Emphasis in original.) *Leech, supra* at 600-01, 775 P.2d at 465.

In *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989), the defendant was convicted of felony motor vehicle homicide. On appeal, he claimed that he should have been allowed to present evidence of the police department's policies on the pursuit of motor vehicles in order to show that an Omaha police officer's conduct contributed to the victim's death. The defendant further claimed that evidence of the officer's contributory negligence was material to whether the defendant's actions were a proximate cause of death. We held that the defendant's conduct was the proximate cause of the victim's death and that the officer's conduct was irrelevant. *Id.* In sustaining the trial court's exclusion of the evidence, we stated:

> Proximate cause has been defined by this court as "a moving or effective cause or fault which, in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the death and without which the death would not have occurred." *State v. Sommers*, 201 Neb. 809, 811-12, 272 N.W.2d 367, 369 (1978). " 'It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the death. . . .' "

*State v. Lytle,* 194 Neb. 353, 358, 231 N.W.2d 681, 685 (1975); *State v. Harris,* 194 Neb. 74, 230 N.W.2d 203 (1975).

*William, supra* at 88, 435 N.W.2d at 177. See, also, *State v. Dixon,* 222 Neb. 787, 387 N.W.2d 682 (1986).

We further stated:

The case of *State v. Rotella,* 196 Neb. 741, 246 N.W.2d 74 (1976), is somewhat analogous to the present case. There, the defendant, who allegedly was driving on the wrong side of the road when he collided with the deceased's car, was convicted of motor vehicle homicide. On appeal, he complained of the trial court's refusal to allow him to present evidence that the deceased had a quantity of amphetamines in his system sufficient to impair his decisionmaking ability. The trial court determined this evidence to be irrelevant.

This court defined the issue thus: "Essentially what defendant is seeking to prove is contributory negligence on the part of the deceased. However, contributory negligence is not a defense to a charge of motor vehicle homicide. *The issue is whether defendant's violation of law was a contributing factor to the death."* (Emphasis supplied.) *Id.* at 743, 246 N.W.2d at 76. The court then cited from other decisions holding that negligence or unlawful acts by another will not absolve the defendant. " 'When one drives a motor vehicle in violation of law pertaining to the operation of such vehicles on the public highway, and, in so doing, as a result of the violation of law, causes death to another, he is guilty of manslaughter, and neither contributory negligence of deceased nor the driver of the car in which deceased was riding when killed, can be invoked to relieve the former of criminal responsibility.' " *Id.* at 744, 246 N.W.2d at 76, citing *Vaca v. State,* 150 Neb. 516, 34 N.W.2d 873 (1948). " 'In criminal cases prosecuted under the motor vehicle homicide act, the negligence or unlawful acts of another driver which proximately contributed to the death, as distinguished from an independent intervening cause thereof, [are] not a defense if the evidence is sufficient to

sustain a conclusion beyond a reasonable doubt that the defendant's negligence or unlawful acts were also a proximate cause of the death of another.' " *Rotella, supra* at 744, 246 N.W.2d at 76, citing *Hoffman v. State*, 162 Neb. 806, 77 N.W.2d 592 (1956).

*William, supra* at 89-90, 435 N.W.2d at 177-78.

In the present case, the defendant's intentional setting of the fire was a contributing factor to the victim's death. The victim died of smoke inhalation and carbon monoxide poisoning, from smoke he inhaled which came from the fire that the defendant intentionally set. But for the fire, the victim's death would not have occurred. Even if there were evidence in the record to support the defendant's theory that the victim should have been able to escape from the burning building, the victim's contributory negligence would not relieve the defendant from criminal responsibility for the homicide unless it was a supervening cause of death, that is, the sole cause of the death. *State v. Leech*, 54 Wash. App. 597, 775 P.2d 463 (1989).

The jury was properly instructed that in order to find the defendant guilty of murder in the first degree, the State had to have proved, beyond a reasonable doubt, that "the defendant, Stanley Prescott Ruyle, killed Robert D. Scott," and that "the defendant did so while in the perpetraion [sic] of an arson of 1445 1/2 'D' Street." The jury was then instructed as to the elements of the crime of arson. In this case, there was no issue concerning intervening cause. The defendant's assignments of error are without merit.

The judgment of the trial court is affirmed.

AFFIRMED.