motion is a bar to retrial only when there is an intent to "'goad' the defendant into moving for a mistrial."[42]

It was not clearly erroneous for the district court to conclude that the prosecutor did not intend to goad Muhannad into moving for the second mistrial. Therefore, double jeopardy does not bar a third trial of Muhannad and the district court did not err in overruling his plea in bar.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court which overruled Muhannad's plea in bar following the second mistrial.

AFFIRMED.

WRIGHT, J., participating on briefs.
HEAVICAN, C.J., not participating.

---

[42] See *Oregon v. Kennedy, supra* note 6, 456 U.S. at 676.

---

STATE OF NEBRASKA, APPELLEE, v.
TERRANCE J. HALE, APPELLANT.
___ N.W.2d ___

Filed February 6, 2015.    No. S-14-183.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.

3. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

4. ____: ____. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

5. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

6. **Rules of Evidence: Hearsay.** For a statement to be an excited utterance, the following criteria must be met: (1) There must be a startling event; (2) the statement must relate to the event; and (3) the declarant must make the statement while under the stress of the event.

7. ____: ____. The true test for an excited utterance is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.

8. ____: ____. Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning.

9. **Rules of Evidence: Hearsay: Police Officers and Sheriffs.** Statements made in response to questions from law enforcement in particular do not generally have inherent guarantees of reliability and trustworthiness. But the declarant's answer to a question may still be an excited utterance if the context shows that the statement was made without conscious reflection.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Scott C. Sladek, and Douglas A. Johnson for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## SUMMARY

Raymond Vasholz died from inhaling smoke from a fire set in his home. His wife, Elizabeth Vasholz, testified that Terrance J. Hale broke into the house, demanded money, assaulted her and Raymond, and set several objects on fire. A jury convicted Hale of first degree murder, and the court sentenced him to life imprisonment. Hale argues that the court erred in allowing two witnesses to testify about out-of-court statements made by Elizabeth. The court overruled Hale's hearsay objections on the ground that the statements were excited utterances. Hale also contends that the evidence is not sufficient to support his conviction. We affirm.

## BACKGROUND

### FIRE AND IMMEDIATE RESPONSE

Elizabeth, 76 years old at the time of the assault, testified that she was living with her husband, Raymond, in Omaha, Nebraska, on February 7, 2013. In the time "leading up to 9 o'clock a.m.," Elizabeth testified that she was sitting in the living room with Raymond when she heard "[b]reaking glass" that "sounded like it was coming from the basement." Elizabeth testified that a man wearing a coat, whom Elizabeth identified in court as Hale, came up the basement stairs. Elizabeth testified that she recognized Hale because he had done yardwork for her, but she did not know him by name.

Elizabeth testified that Hale demanded money. After she replied that she had no money, Elizabeth said that Hale assaulted her and Raymond. As Hale hit Raymond, Elizabeth recalled striking Hale's back with a lamp. Elizabeth testified that Hale grabbed "a paper" and lit it using the gas stove. Elizabeth said that Hale threw the lit paper at her and then set a couch cushion on fire and "came at" her, pushing the burning cushion against her arms.

Elizabeth testified that she escaped the house, grabbing a recycling bin to cover herself because Hale had torn off the pajama top she had been wearing. She recalled knocking on her neighbor's door, but no one answered, so she sat on her neighbor's porch and began "screaming my head off." Elizabeth stated that Hale then came outside and "threw his coat down." Then another man arrived, and Elizabeth asked him for help. After police arrived, Elizabeth recalled that they arrested Hale because she yelled, "That's him, that's him," while pointing at Hale. Elizabeth stated that she suffered burns on her back and both arms and cracked vertebrae.

About 9 a.m., Gary Burns was driving in his car when he saw an elderly woman sitting outside. Burns said that the woman—who was "real dingy and dirty" and looked like "she had been beat up, basically,"—had no shirt on, and was covering herself with a recycling bin. The woman was yelling, "'Help, help, help.'" Burns also saw a man, whom he identified in court as Hale, about 15 feet from the woman.

Burns got out of his car and called the 911 emergency dispatch service to report an assault. As he approached the woman, Burns testified that she pointed at Hale and said, "'You did this, you did it.'" According to Burns, Hale threw up his arms and said, "'I didn't do this.'"

Firefighters responded to an alarm for a house fire at 9:12 a.m. Smoke was escaping from the house when they arrived. Inside they found "pockets of fire" that they quickly extinguished.

The firefighters searched the house for victims and found a man, later identified as Raymond, lying across a bed in a bedroom. The firefighters carried Raymond out of the house and to the front yard, where paramedics immediately attended to him. A paramedic testified that Raymond was not breathing and did not have a pulse. Electronic monitors placed on Raymond while an ambulance transported him to a hospital showed no signs of cardiac activity.

Police officer Roger Oseka was patrolling with a training officer, Patrick Andersen, when they heard a request for assistance over the radio at 9:12 a.m. Oseka estimated that it took him and Andersen less than 5 minutes to reach the scene. When Oseka arrived, he saw an elderly white woman sitting on the "front porch" of a neighbor's house. Oseka also saw a black man, whom he identified in court as Hale, "walking in circles" and saying, "'I was trying to save them.'"

Oseka exited his cruiser and approached the woman, whom he said was bleeding from her nose and mouth and had "burn sores" on both arms. Oseka observed the woman "throwing up or spitting into" a green recycling bin. He made contact with the woman and described her "tone" as "[s]urprisingly, for the chaotic scene . . . was calm, but yet concise." Oseka talked with the woman and—after the court overruled Hale's hearsay objection—he testified that the woman "looked past me, raised her arm and pointed it and said, 'He did it.'" Oseka turned and saw Hale standing where the woman was pointing. Oseka then directed Andersen to arrest Hale.

Andersen said that the woman appeared to be in "a state of shock" and was "screaming" at them and fire personnel. When

the State asked, "[W]hat does she scream to you?" Andersen testified that the woman said, "'That's him. He did this.'" As she screamed, Andersen said that the woman pointed at a black man, whom Andersen identified in court as Hale. Andersen stated that Hale thereafter screamed, "'I tried to help them. I saved her, but I couldn't save him.'"

William Guidebeck, a paramedic, arrived at about 9:19 a.m. and saw a woman sitting on a "neighbors' stoop," cradling a green recycling bin against her chest. Guidebeck observed that she was not wearing a shirt but had a green coat with blood on it draped over her back. Guidebeck described the condition of the woman: "She was in pain. She was kind of hanging her arms over the recycle bin as to not touch anything. She had burns—severe burns on her arms, on her face. Her hair was singed. She just kind of had a blank look on her face." Guidebeck also noted that she had a "significant amount of soot around her mouth and nose."

Nevertheless, Guidebeck testified that the woman was "alert and oriented," based on her answers to the "times three" questions of "[p]erson, place, and time." That is, she "knew where she was at, she knew what day it was, and she was very aware of her surroundings." Guidebeck removed the coat, and he testified that the woman "reacted in pain."

At this point in Guidebeck's testimony, the State asked whether he had "receive[d] any response of any kind from this female patient." Hale objected on hearsay grounds. The court overruled Hale's objection on the ground that Elizabeth's answer was an excited utterance. Guidebeck testified:

> We removed the coat from her. We threw it down. Asked her if there was anybody else inside. She said her husband. We asked her if that was her husband's coat, because it was kind of odd that she didn't have a shirt on, but she had a coat draped around her. When I asked if that was her husband's coat, she said, "No." We asked her whose coat it was, and she said, "It's his."

After the court overruled another hearsay objection from Hale, Guidebeck testified, "And we said, 'Whose?' And she pointed in the direction of one of the [police] cars." Guidebeck knew that someone was in the cruiser, but he could not see who.

## Investigation

Raymond was pronounced dead during the afternoon of February 7, 2013. A coroner's physician performed an autopsy on February 8. He testified that 10 to 18 percent of the body was covered by second-degree burns. Additionally, the autopsy showed numerous abrasions, lacerations, and bruises. The physician stated that "soot" in the trachea and lungs showed that Raymond had been alive during the fire. Blood sample tests showed a fatal amount of carbon monoxide. The physician testified that Raymond's death was caused by "the complication of breathing smoke, soot, carbon monoxide, and the other hot gasses in the fire, [and] being burned by the fire."

Fire investigator Michael Shane McClanahan examined the house on February 7, 2013. McClanahan identified six different points of origin, each independent of the other. McClanahan also found a couch cushion with "thermal damage." McClanahan opined that the fire was "intentionally-set," based on the multiple points of origin and no indication that they would have naturally spread from one to another. McClanahan testified that his conclusions were consistent with Elizabeth's description of events.

Inside, the house showed signs of a violent struggle. Firefighters saw what appeared to be "blood streaks" on a refrigerator in the kitchen. Photographs of the house showed "apparent blood" on the leg of an upturned table, a windowsill in the room where Raymond was found, an exterior door, and the wall leading to the basement. "[A]pparent blood" was also documented on the sleeve and lining of the green coat and on the recycling bin. Additionally, a pane in a basement window was broken and the latch used to open the window was bent. A handprint was pressed into the dirt outside the window.

Regarding Hale's condition, Oseka testified that he offered Hale medical attention because Hale was "complaining that he was in the house and he was breathing in the smoke and he was coughing." Andersen said that Hale "started coughing up or spitting up black soot" after he drank some water. Photographs of Hale after his arrest show a small cut on his nose, a scratch on his right arm, a small cut on his right leg, and "scrapes or lacerations" on his back.

The University of Nebraska Medical Center performed a forensic DNA analysis of several items retrieved from the scene. Blood on the "left chest area" and left sleeve of the green coat generated a genetic profile matching Elizabeth's. Hale's DNA profile was consistent with blood on the right sleeve of the coat. The probability of an unrelated African American individual matching the profile is 1 in 6.35 quintillion.

Hale did not testify, but the State played for the jury several recordings of his statements. In a statement to police, Hale said that he "tried to save this lady." Hale said that he was walking near the Vasholzes' home when he saw smoke. Because the doors were locked, Hale said that he kicked in a basement window and pulled Elizabeth from the house.

Four days after Raymond's death, Hale sat for an interview with local media. During the interview, Hale said that he was walking to a bus stop when he saw smoke rising from the Vasholzes' house. Hale said that he opened a door and saw an older woman that he recognized as a neighbor. Hale pulled her out of the house and went back for her husband when "somebody attacked me from behind." Hale said that he went to the basement, broke a window, climbed out, called 911, and waited for police to arrive. Hale said that he covered the woman with his coat, but she told him to get away. Hale claimed that the police caused the laceration to his nose when they took him into custody.

At trial, Hale's attorneys emphasized the differences in Elizabeth's accounts of the event. Police officer Scott Warner interviewed Elizabeth on February 8 and 19, 2013. The first interview occurred when Elizabeth was still at the hospital, and Warner testified that she was "medicated that time with morphine," "spoke very quietly," and "spent most of the time with her eyes closed." During the first interview, Elizabeth told Warner that it was "getting darker" at the time of the attack and that her assailant wore a colorful hat. Warner asked Elizabeth whether she had seen her assailant before February 7, and she said, "'I really don't know.'"

At the second interview, Warner testified that Elizabeth said she recognized the man because he had previously done

yardwork for her. Elizabeth again told Warner that her assailant wore a hat.

At trial, Elizabeth testified that she could not recall whether Hale wore a hat, and there is no evidence that he did. Elizabeth also testified that the green coat was never over her shoulders.

In the operative information, the State charged Hale with one count of first degree murder under Neb. Rev. Stat. § 28-303(2) (Reissue 2008). The information alleged that Hale killed Raymond while committing, or attempting to commit, a robbery, burglary, or arson.

A jury convicted Hale, and the court sentenced him to life imprisonment.

## ASSIGNMENTS OF ERROR

Hale assigns, restated, that (1) the court erred in overruling his hearsay objections to Oseka's and Guidebeck's testimony about Elizabeth's out-of-court statements and (2) the evidence is not sufficient to support his conviction.

## STANDARD OF REVIEW

[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1]

[2] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.[2]

[3,4] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the

---

[1] *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014).

[2] See *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014).

finder of fact.[3] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4]

## ANALYSIS

### OSEKA'S AND GUIDEBECK'S TESTIMONY

Hale argues that the court erred in overruling his hearsay objections to testimony by Oseka and Guidebeck about out-of-court statements made by Elizabeth. Regarding Oseka's testimony, Hale argues that the statement to which Oseka testified was not an excited utterance because Oseka described Elizabeth as "'calm and concise.'"[5] Regarding Guidebeck's testimony, Hale contends that the statement to which Guidebeck testified was not an excited utterance because Elizabeth spoke after conscious reflection and in response to "investigative questioning."[6]

[5] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[7] Hearsay is not admissible unless otherwise provided for under the Nebraska Evidence Rules or elsewhere.[8]

To recap, Oseka testified that Elizabeth pointed at Hale and said, "'He did it.'" Guidebeck testified that he asked Elizabeth whose coat was draped over her shoulders and that she said, "'It's his,'" while pointing at an individual in a police cruiser. Elizabeth made her statement to Oseka before her statement to Guidebeck. Both statements are hearsay.

[6] Excited utterances are one of the exceptions to the prohibition of hearsay.[9] For a statement to be an excited utterance,

---

[3] *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014).

[4] See *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014).

[5] Brief for appellant at 10.

[6] *Id.* at 9.

[7] *State v. Castillo-Zamora, supra* note 2.

[8] *Id.*

[9] See *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

the following criteria must be met: (1) There must be a star-
tling event; (2) the statement must relate to the event; and (3)
the declarant must make the statement while under the stress of
the event.[10] The justification for the excited utterance exception
is that circumstances may produce a condition of excitement
which temporarily stills the capacity for reflection and pro-
duces utterances free of conscious fabrication.[11]

Hale does not dispute that the attack Elizabeth suffered
and witnessed was a startling event. And when the startling
event is the commission of a crime, a statement identifying
the perpetrator relates to the event.[12] So, the issue is whether
Elizabeth made her statements to Oseka and Guidebeck while
still under the stress from the assault and fire.

[7] An excited utterance does not have to be contempora-
neous with the exciting event.[13] It may be subsequent to the
event if there was not time for the exciting influence to lose
its sway.[14] The true test is not when the exclamation was
made but whether, under all the circumstances, the declarant
was still speaking under the stress of nervous excitement and
shock caused by the event.[15] Therefore, the lapse of time is
not dispositive,[16] and the proponent does not have to produce
definitive evidence of the time of the startling event.[17] The
period in which the exception applies depends on the facts of
the case.[18]

[8,9] Relevant facts include the declarant's manifestation
of stress,[19] such as "yelling,"[20] and the declarant's physical

---

[10] See *State v. Castillo-Zamora, supra* note 2.

[11] *Id.*

[12] See *State v. Smith, supra* note 9.

[13] *State v. Castillo-Zamora, supra* note 2.

[14] *Id.*

[15] See *id.*

[16] See *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

[17] *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[18] *State v. Castillo-Zamora, supra* note 2.

[19] See, e.g., *id.*

[20] See *State v. Canbaz*, 259 Neb. 583, 591, 611 N.W.2d 395, 402 (2000).

condition.[21] Also relevant is whether the declarant spoke in response to questioning.[22] Statements made in response to questions from law enforcement in particular do not generally have inherent guarantees of reliability and trustworthiness.[23] But the declarant's answer to a question may still be an excited utterance if the context shows that the statement was made without conscious reflection.[24]

Here, Elizabeth testified that the attack occurred in the period "leading up to 9 o'clock a.m." on February 7, 2013. Burns testified that he saw Elizabeth "yelling" for help on her neighbor's stoop at "approximately 9 a.m." An alarm for a house fire was sounded at 9:12 a.m., and Oseka and Andersen testified that they arrived in less than 5 minutes. Guidebeck estimated that he arrived at "about 9:19 a.m."

So, we can infer that Oseka and Guidebeck arrived minutes after Elizabeth left her burning home. And they both found Elizabeth sitting on a neighbor's stoop in pajama bottoms, with untreated "severe burns," cradling a plastic recycling bin against her bare chest in the "chilly" February air.

Whether Elizabeth was still stressed when she spoke to Oseka is a difficult question. Oseka testified that when he and Andersen approached Elizabeth, she "had open burn sores on both her left and right arms" and was bleeding from these sores and her mouth. Additionally, Oseka stated that Elizabeth was "throwing up or spitting into" the recycling bin. Nevertheless, Oseka testified that Elizabeth, "[s]urprisingly, for the chaotic scene . . . was calm, but yet concise." If this was the only description of Elizabeth's demeanor, her statement to Oseka would not be an excited utterance.

But Andersen witnessed—and testified about—the same statement, and he described Elizabeth differently. According

---

[21] *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012).

[22] *Id*.

[23] See *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993). See, also, *State v. Sullivan*, 236 Neb. 344, 461 N.W.2d 84 (1990).

[24] *Werner v. County of Platte, supra* note 21. See *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473 (2005); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990).

to Andersen, Elizabeth was in a "state of shock" and was "screaming" at the responders. In fact, Andersen described Elizabeth's identification of Hale not as a "statement," but as a "scream."

So, Oseka's and Andersen's accounts of Elizabeth's apparent stress level differ. But considering the totality of the circumstances—including the nearness of the event and Elizabeth's manifestations of physical stress—we conclude that Elizabeth was still under the stress from the assault and fire when she identified Hale as the perpetrator. The court did not err by overruling Hale's hearsay objection to Oseka's testimony.

We similarly conclude that Elizabeth's statement to Guidebeck was an excited utterance. Guidebeck testified that Elizabeth was visibly "in pain" when he approached. Her hair was singed, and she had burns on her arms and face. Guidebeck testified that Elizabeth "had a blank look on her face." From these facts, we can infer that Elizabeth was under the stress of the assault and fire when she spoke to Guidebeck. Hale emphasizes that Guidebeck also described Elizabeth as "alert and oriented" because she knew who she was, where she was, and the day. But alertness is not inconsistent with a stimulation of the sympathetic nervous system from the adrenal gland's release of hormones, a possible response to stress.[25] Hale also notes that Elizabeth told Guidebeck that the green coat belonged to the person in the back of a police cruiser only after Guidebeck asked whose coat it was. But the record does not indicate that Elizabeth labored over the question, and we conclude that her answer—"'[i]t's his'"—did not involve conscious reflection.

### Sufficiency of the Evidence

Hale argues that the evidence is not sufficient to support his conviction. He contends that Elizabeth's testimony was

---

[25] See, Attorney's Illustrated Medical Dictionary E31 (West 1997); Emily Campbell, Comment, *The Psychopath and the Definition of "Mental Disease or Defect" Under the Model Penal Code Test of Insanity: A Question of Psychology or a Question of Law?* 69 Neb. L. Rev. 190 (1990).

critical to the State's case and that her credibility is questionable due to her "admitted confusion" and the differences between her trial testimony and her statements to Warner.[26] Hale also claims that the State produced little physical evidence and failed to more aggressively investigate another man who was spotted near the Vasholzes' home.

The State prosecuted Hale under the species of first degree murder known as felony murder. Section 28-303 provides: "A person commits murder in the first degree if he or she kills another person . . . (2) in the perpetration of or attempt to perpetrate any sexual assault in the first degree, arson, robbery, kidnapping, hijacking of any public or private means of transportation, or burglary . . . ." The critical difference between felony murder and premeditated first degree murder is that the intent to commit the underlying felony is substituted for an intent to kill.[27] Here, the underlying felonies alleged in the operative information and put to the jury were robbery, burglary, or arson.

We conclude that the evidence is sufficient to support Hale's conviction. Elizabeth and McClanahan testified that someone intentionally damaged the Vasholzes' home and contents by starting a fire. The coroner's physician testified that Raymond died from breathing in smoke and carbon monoxide from the fire. Elizabeth testified that Hale was the person who intentionally set the fire, and her account is supported by circumstantial evidence such as Hale's blood on the green coat and the marks on his body. Viewing the evidence in the light most favorable to the State, a rational fact finder could have found beyond a reasonable doubt that Hale killed Raymond in the perpetration of an arson.[28] We need not address whether the same conclusion can be reached under the two alternate underlying felonies of robbery and burglary.[29]

---

[26] Brief for appellant at 12.

[27] See *State v. Ely*, 287 Neb. 147, 841 N.W.2d 216 (2014).

[28] See, Neb. Rev. Stat. § 28-503(1) (Cum. Supp. 2014); *State v. Ruyle*, 234 Neb. 760, 452 N.W.2d 734 (1990).

[29] *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014).

Elizabeth's recounting of the events at trial differed somewhat from her statements to Warner, and her statements to Warner themselves were not identical. This was a matter that the jury could consider when weighing Elizabeth's testimony and credibility, but it is not a matter for us. Our question is only whether a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt.[30] The credibility and weight of witness testimony is the province of the jury, and we will not reassess credibility on appellate review.[31]

## CONCLUSION

We conclude that the out-of-court statements Oseka and Guidebeck testified about were excited utterances, and therefore admissible despite their hearsay status. And we conclude that the evidence is sufficient to support Hale's conviction for murder in the first degree.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.

---

[30] See *State v. Matit, supra* note 4.

[31] See, *State v. Tolbert*, 288 Neb. 732, 851 N.W.2d 74 (2014); *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

---

STATE OF NEBRASKA, APPELLEE, v.
RAMEZ MERHEB, APPELLANT.
___ N.W.2d ___

Filed February 6, 2015.    No. S-14-315.

1. **Appeal and Error.** To the extent issues of law are presented, an appellate court has an obligation to reach independent conclusions irrespective of the determinations made by the court below.
2. **Constitutional Law: Postconviction.** A manifest injustice common-law claim must be founded on a constitutional right that cannot and never could have been vindicated under the Nebraska Postconviction Act or by any other means.
3. **Constitutional Law: Effectiveness of Counsel: Convictions.** As a general proposition, counsel's advice about collateral matters—those not involving the direct consequences of a criminal conviction—are irrelevant under the Sixth Amendment.