STATE OF NEBRASKA, APPELLEE, V. KEVIN ISAAC RIFE, APPELLANT.

337 N.W.2d 724

Filed August 5, 1983. No. 82-659.

Richard J. Bruckner, for appellant.

Paul L. Douglas, Attorney General, and Mel Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

WHITE, J.

This is an appeal from the District Court for Sarpy County, Nebraska, from a verdict of guilty to second degree murder and a sentence of 30 years. Appel-

lant appeals and assigns that the trial court erred in (1) failing to sustain appellant's motion to suppress statements given by appellant to the Bellevue police; (2) failing to sustain appellant's motion for change of venue or continuance; (3) failing to grant a mistrial based upon jury misconduct during the trial; (4) failing to grant a mistrial based upon the introduction and viewing by the jury of a video tape of the murder scene; (5) allowing prejudicial and inflammatory photographs and testimony into evidence; and (6) failing to give appellant's requested instruction regarding *Miranda* warnings. We affirm. A statement of the facts is necessary.

On Saturday night, January 23, 1982, Lori Lappin and two friends attended a party in Bellevue, Nebraska, arriving home at 1 a.m. Edel Cook remained behind at the apartment she shared with Lori and went to work at the Crown Court restaurant, which was also in Bellevue, on Sunday morning, January 24, 1982. Lori left the apartment with her boyfriend, Mark Hensley, that day at 1:30 p.m. and did not return until 8 p.m. Upon opening the door they discovered the body of Edel Cook on the sofa against the north wall in the living room. There was a large amount of blood on the face of Edel and the north wall of the apartment. Edel's body was covered with a quilt which left uncovered her feet at one end and from the shoulders up at the other end. Edel's face did not have normal symmetry and had the appearance of being crushed from a severe beating. There was a deep laceration extending across her throat, and a serrated steak knife was found on the floor near the sofa. Around Edel's body were pieces of a ceramic vase and mug which had been broken. These pieces were lying next to and underneath Edel's body and also on the floor in front of the couch and by the hallway on the south side of the couch.

The shorts that Edel had been wearing at the time of her death had been cut in two at the crotch area

and her panties had been partially pulled down, with blood smeared in the area of her thighs. The Bellevue police were called.

The police could find no visible signs of forced entry or attempted forced entry into the building, and the lock on the apartment door was in good working order. In a kitchen drawer the plastic divider that contained knives was stained with blood, as was one steak knife in the drawer. The bathroom sink and faucet were stained with blood.

During the ensuing police investigation, Kevin Isaac Rife, a friend of the deceased, was interviewed by Det. David Carlson of the Bellevue police at approximately 2:30 a.m. on Monday, January 25, 1982. The interview lasted 25 minutes and related to the fact that appellant worked with the victim at Crown Court and was living in the apartment building next door; and to the appellant's activities on the date of the homicide, Sunday, January 24, 1982. Appellant was not a suspect at the time the interview took place, and he told police that he was at his parents' home in Bellevue all day Sunday until 7 p.m.

On Wednesday, January 27, 1982, Detective Carlson and Officer Joseph Jeanette questioned appellant's parents, Mr. and Mrs. Carl Rife, in an attempt to verify appellant's whereabouts on the date of the murder. They ascertained that appellant had been at his parents' home until 3 p.m., when his mother dropped him off at his apartment.

At 9:15 a.m. on Thursday morning, January 28, 1982, Officer Jeanette and Det. Dick Warren went to appellant's apartment to discuss the discrepancy regarding appellant's whereabouts on Sunday, the day of the murder. The appellant stated that he was nervous and scared when police came over and he just told them that he was not at his apartment that day. The officers then read the appellant his rights per *Miranda*. The appellant consented to a search

of his apartment, and the officers asked him if he would come to the police station at 1 p.m. so he could be fingerprinted and interviewed by Detective Carlson.

At approximately 1:15 p.m. on Thursday, January 28, 1982, the appellant met Detective Carlson at the Bellevue police station to be fingerprinted, which took roughly 20 minutes. Following the fingerprinting, Detective Carlson directed the appellant to an interview room, where he was again advised of his *Miranda* rights. Detective Carlson filled in the appellant's name, address, date of birth, highest grade of education, and that the interview was being conducted in connection with a homicide. The rights advisory form was handed to the appellant and he was asked to read the top portion that had been filled in. Detective Carlson testified that appellant appeared to read the top portion of the form and he then read to appellant each of his rights from a blank form and asked him to follow along on the filled-in form. Appellant was further directed to answer aloud after each question and mark his answer under each question in the space provided. The appellant acknowledged that he was aware of each of his rights and stated that he was willing to make a statement and waive the services of an attorney.

Detective Carlson confronted the appellant with several statements he had made that conflicted with information the Bellevue police had. The appellant was questioned for about 15 minutes. When asked, "Why are you telling all these lies?" the appellant responded, "Because I killed Edel." The questioning continued for 45 to 50 minutes to determine the details of the murder. The appellant stated he saw Edel's car outside and a light on in her apartment. He went in and Edel gave him some acid or speed, and he began to freak out. At this time Edel was on the couch and rolled over as if she were going to go to sleep. He became angry and hit Edel several times over the head with a vase, until it shattered.

He then picked up a larger vase, and as he struck her again the second vase also broke. The appellant stated that he realized what he had done and that if Edel lived he would be in big trouble. He went into the kitchen to get a knife, took the knife out of the top drawer in the kitchen, and went back to Edel and cut her throat twice from left to right. He then went into the bathroom to wash the blood from his hands.

Detective Carlson obtained a tape cassette recorder upon which the appellant and he repeated basically the same conversation. Appellant was again read his *Miranda* rights. The tape-recorded statement was concluded at approximately 3:25 p.m. The appellant was asked to make a written statement pertaining to the crime, and to sign it. The appellant agreed. The appellant was furnished a meal and was then questioned again at 9:30 p.m. to clear up inconsistencies about the drugs he had taken and whether or not he had sexually assaulted Edel. The appellant was again given the *Miranda* warnings. In the 9:30 p.m. confession, which was taped, the appellant stated that he had not taken any drugs and that he had cut Edel's shorts with the knife, after her throat had been cut, and placed his middle finger in her vagina. Appellant did not at any time request an attorney or that the questioning stop. The appellant was charged with first degree murder, subsequently convicted of second degree murder, and sentenced to 30 years of hard labor.

We will discuss the assignments in order.

"To be admissible, a statement or confession must be free and voluntary. It must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. The determination of whether a statement was voluntarily made necessarily turns on the consideration of the totality of the circumstances in any particular case." *State v. Hunsberger*, 211 Neb. 667, 669-70, 319

N.W.2d 757, 759 (1982); *State v. McDonald*, 195 Neb. 625, 240 N.W.2d 8 (1976).

A finding of the trial court that a statement of an accused is voluntary will not ordinarily be set aside on appeal unless the finding is clearly erroneous. *State v. Thompson*, 198 Neb. 48, 251 N.W.2d 387 (1977).

The appellant argues that "Detective Carlson did not bother to read the Rights Advisory form to appellant. He felt appellant understood it because his eyes traveled over the paper." Brief for Appellant at 31. This contention is simply not borne out by the record. Appellant was verbally advised of his constitutional rights on at least four separate occasions. Both the testimony of the appellant and Detective Carlson concur that appellant was asked to read the top portion of the advisory form, which contained information personal to himself, and then was verbally advised of his constitutional rights and asked to acknowledge yes or no after each question.

The appellant also argues that because the police knew before they questioned him that he was 5 feet 2 inches tall, weighed 109 pounds, lost his hair due to a thyroid condition, was a follower and very timid, that these facts, coupled with a small, windowless interrogation room, rendered his confession involuntary under the totality of the circumstances. We do not agree. The trial court found that the appellant was at all times fully advised of his constitutional rights during questioning, and found that he freely and intelligently chose to waive those rights. Appellant's alleged requests to speak to his parents could not be construed as a request for an attorney. The appellant did not sound intimidated during his two taped confessions, and, in fact, he went to great lengths to duplicate for Detective Carlson the surprised sound of the victim's voice when he first struck her about the head with the vase before she lost consciousness. There were no leading questions asked or promises or threats made to the appellant

in return for his confession. The finding of the trial court is amply supported by the record. The question of whether the appellant's statements were voluntary was also submitted to the jury under full and complete instructions. The first assignment is without merit.

The appellant next alleges that the trial court erred in failing to grant his motion for a change of venue or continuance. A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse of discretion is shown. *State v. Boyer*, 211 Neb. 139, 318 N.W.2d 60 (1982); *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

An examination of the newspaper clippings and affidavit in support of the motion reveal no animosity or hostility directed toward the appellant. While the substance of the appellant's confession was discussed, the appellant made no effort to have the hearing closed, and the information that was disseminated was nothing more than that conventionally reported in news accounts of a trial, with the exception of one article. The Bellevue Leader published an extensive article in regard to the suppression hearing prior to its completion. The July 7, 1982, article quotes extensively from direct interview comments made to the Bellevue Leader by Deputy Sarpy County Attorney John Irwin: "Irwin expressed his confidence in the confession obtained from Rife by these officers and the techniques used with the alleged murderer. 'They're good witnesses, good policemen and they follow good techniques. . . They did their job just fine. There's nothing you could find that they did wrong (in regard to obtaining a confession from Rife.)' "

The public comments by Mr. Irwin appear to constitute a serious violation of Canon 7, DR 7-107(B)(3) and (5), of the Code of Professional Responsibility,

which provides: "A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

. . . .
"3. The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

. . . .
"5. The identity, testimony, or credibility of a prospective witness."

However, the record shows that the trial court was thorough in its questioning in order to insure that none of the veniremen had a preconceived notion of the appellant's guilt because of the media coverage, and no person was allowed to serve on the jury who was a subscriber to the Bellevue Leader, or who had read the article.

The appellant has failed to show that the jury was not impartial. Further, counsel accepted the jury without exhausting all of his peremptory challenges. Thus, counsel must have been satisfied that the jurors were fair and impartial. *The People v. Speck*, 41 Ill. 2d 177, 242 N.E.2d 208 (1968); *State v. Lejeune*, 248 La. 682, 181 So. 2d 392 (1965), *cert. denied* 385 U.S. 845, 87 S. Ct. 37, 17 L. Ed. 2d 77 (1966).

In *Bufford v. State*, 148 Neb. 38, 42-43, 26 N.W.2d 383, 386 (1947), this court stated: "The true object of challenges, either peremptory or for cause, is to enable the parties to avoid disqualified persons and secure an impartial jury. When that end is accomplished there can be no just ground for complaint against the rulings of the court as to competency of the jurors."

The trial court did not abuse its discretion in denying a change of venue or a continuance. The motion for a continuance was attached to the motion for a change in venue, as an alternative remedy. We note from the record that appellant's motion for a continuance was more in the nature of a procedural step to preserve his right to complain of the pretrial publicity rather than a genuine desire to have the trial delayed to · permit the advance effect of publicity to wane. We make this conclusion based upon the fact that appellant's counsel was satisfied with the court's ruling which took the combined motion under advisement until it could be determined whether an impartial jury could be selected. Once the jury was impaneled, the appellant did not renew his motion for a continuance before the start of trial. Each time the motion was argued, the appellant's counsel stressed the need for a change in venue but did not discuss the need for a continuance. The second assignment is without merit.

During the trial one of the jurors indicated that she had watched a television report on Omaha channel 3. The appellant complains that the trial court erred in failing to grant his motion for mistrial based upon this alleged juror misconduct. There is no showing in the record of the content of the television report. One other juror during trial was found to have had the same employer as the appellant and the deceased. The juror stated to the court that she had worked there on the late shift, after the murder had occurred, as an auditor. The parties agreed to excusing her, and an alternate juror replaced her. In the absence of a showing of prejudice, the trial court was correct in denying the motion for mistrial. Opportunity for prejudice or disqualification of jurors does not raise a presumption that prejudice or disqualification exists. *State v. Beasley*, 183 Neb. 681, 163 N.W.2d 783 (1969).

The appellant next argues that the trial court erred in admitting color photographs of the de-

ceased and a black and white video tape which showed the body as it was discovered at the crime scene. The basis for appellant's contention is that in addition to the relevancy of the exhibits being outweighed by their prejudice, the photographs and video tape were also unnecessarily cumulative because the autopsy report had been stipulated to.

Admission of video tapes is generally within the trial court's discretion, subject to the same requirements for admission of still photographs. *State v. Brooks*, 30 Wash. App. 280, 633 P.2d 1345 (1981).

Only four of the still photographs offered into evidence were pictures of the deceased and could be considered gruesome. Other photographs of the crime scene will not be discussed, due to the fact that counsel for the appellant also introduced a proof sheet or series of small photographs of the crime scene himself.

Two of the color photographs at issue show the head area of the body of Edel Cook as it was found shortly after police were summoned to her apartment. Detective Warren, who was the first person to the crime scene after the murder was reported, testified that both photographs accurately depicted the body as he saw it on January 24, 1982. The third photograph and duplicate slide were taken just prior to the autopsy of the deceased. The pathologist testified that the photograph and slide would be helpful in assisting him in explaining his findings to the jury. The slide was shown to the jury, but only the photograph was permitted to go to the jury room. As the jury viewed the slide the pathologist pointed out that the deceased had received several blows to the face resulting in multiple fractures of the top portion of the skull, with the brain exposed, fracture of the nasal bones, broken teeth, and severe hemorrhaging about the head. He concluded that Edel Cook was still alive from her head wounds but died as a result of a deeply penetrating laceration in her neck, which severed her windpipe, trachea, and

jugular vein. He testified that his conclusion regarding the cause of death was based upon the fact that the neck wound was covered with a red, foamy material that occurs when the trachea is severed and a person is still breathing. The last still photograph depicts the body of Edel Cook and is illustrative of the fact that she was sexually assaulted at the time of her death. The video tape showed the body as it was discovered at the crime scene.

In a homicide case photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of the wounds and injuries, and to establish malice or intent. *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

The appellant does not challenge the foundation laid for the video tape or photographs, and we are not persuaded that the relevance was outweighed by the prejudice they may have caused. A photograph which illustrates or makes clear some controverted issue in a homicide case may be received even if it is gruesome, where a proper foundation has been laid. *State v. Jones, supra*; *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977).

Each of the photographs and the video tape that were admitted into evidence were relevant to prove the condition of the victim's body, the cause of death, intent and malice, and to corroborate the confession of the appellant that he was intimately familiar with the details of the murder.

The appellant stipulated that the body that was found was indeed Edel Cook and that the death certificate concerning Edel Cook could be introduced into evidence without further foundation. We have searched the record and are unable to find any stipulation to the cause of death in the autopsy, nor that the appellant had the requisite intent or malice for

the crime. Further, appellant does not cite this court to any such stipulation.

Under similar facts the Washington Court of Appeals held that the admission of five photographs and a video tape of a murder victim was not an abuse of discretion on the grounds that they were gruesome or that they were unnecessary because the defendant was willing to stipulate that the victim died of gunshot wounds. *State v. Tharp*, 27 Wash. App. 198, 616 P.2d 693 (1980), *aff'd* 96 Wash. 2d 591, 637 P.2d 961 (1981).

Further, we are unable to find anything in the record to show that the photographs or video tape were unnecessarily cumulative or admitted solely to influence the passions of the jury. There was no abuse of discretion.

Finally, the appellant urges this court to find reversible error by the trial court's failure to add to the NJI 14.52A to include "(e) That the interrogation may terminate at anytime he (the accused) may desire." Brief for Appellant at 40.

We held in *State v. Price*, 202 Neb. 308, 275 N.W.2d 82 (1979), that a court, even if requested, is not required to give NJI 14.52A. The appellant was given the benefit of submitting to the jury questions of law concerning the admissibility of a confession under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He will not be heard to complain that the court did not submit additional questions of law to the jury. The assignment is without merit.

The judgment is affirmed.

AFFIRMED.