STATE OF NEBRASKA, APPELLEE,
v. DAVID LEE QUINTANA, APPELLANT.
621 N.W. 2d 121

Filed January 12, 2001.    Nos. S-99-1249, S-99-1250.

John H. Marsh, of Knapp, Fangmeyer, Aschwege, Besse & Marsh, P.C., for appellant.

Don Stenberg, Attorney General, and Susan J. Gustafson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Appellant, David Lee Quintana, was convicted and sentenced to life imprisonment for first degree murder by intentionally aiding and abetting Jaime Rodriguez (Rodriguez) to commit the crime of robbery of Roger Baumann, during which robbery the death of Baumann resulted. Quintana was also sentenced to not less than 7 nor more than 15 years' imprisonment for his conviction of aiding and abetting the use of a firearm to commit a felony. Cases Nos. S-99-1249 and S-99-1250 were consolidated for oral argument and disposition in this court. This court took this case on direct appeal due to the imposition of a life sentence.

## ASSIGNMENTS OF ERROR

Quintana assigns that the trial court erred (1) in failing to dismiss the case when the evidence was insufficient to sustain a conviction as a matter of law, (2) in failing to grant a change of venue, (3) in failing to properly instruct the jury regarding the essential element of proximate cause, (4) in limiting Quintana's cross-examination of Abie Cash regarding alcohol use and/or arrest prior to trial, (5) in failing to properly instruct the jury regarding accomplice testimony, (6) in failing to grant a mistrial, (7) in permitting cumulative testimony regarding a statement by Quintana that he asked if Rodriguez had gotten Baumann's wallet, and (8) in not striking potential juror W.W. for cause.

## BACKGROUND

On January 22, 1999, Quintana, along with his girl friend Wendy Grim and two other friends, Rodriguez and Tony Rodriguez (no relation), went to the Days Inn motel to visit Baumann. Tony Rodriguez testified that on the way to the motel, Quintana said that "[Baumann] had owed him some money, and he was going to get it." Quintana left a small pistol with Tony Rodriguez, and then Quintana and Grim went to Baumann's room. Tony Rodriguez and Rodriguez went to a nearby convenience store and then remained in the car. According to Grim's testimony, when Quintana and Grim entered the motel room, Baumann was there, but Quintana and Grim immediately became suspicious because there was another man talking on the telephone with his back toward them. Neither Quintana nor Grim knew the identity of this man. Quintana and Grim stayed only a few minutes and then left.

Testimony from several witnesses establishes that both Quintana and Grim believed that Baumann was a "narc" and were therefore angry and suspicious toward Baumann. Grim testified that she thought Baumann had violated his parole earlier and therefore should have been in jail. According to Cash, Quintana believed he was being set up. After Quintana and Grim left Baumann's motel room, they went to Rodriguez' house. Cash testified that Quintana called Baumann and asked him to meet at the "Chug-a-Lug" bar the following evening.

That next evening, Cash drove Quintana, Grim, Rodriguez, and Stacie Miller to the Chug-a-Lug bar. Later, they all went to Rodriguez' house, where Baumann "laid out some lines" of "meth" for Quintana, Grim, and Miller. Believing Baumann was a "narc," Quintana and Grim did not consume any methamphetamine. Shortly after 1 a.m., Quintana, Grim, and Rodriguez left to go to a party with Baumann in Baumann's pickup truck. Baumann drove, Quintana sat in the middle, Grim sat on Quintana's lap, and Rodriguez sat in the passenger seat next to the window. Grim was going to ride with Cash and Miller, but Quintana stated that he wanted her to go with him because Baumann would "think something's up." Grim testified that Quintana said to her that Baumann "was going to get fucked up." Cash testified that in talking to Quintana and Rodriguez

before they all left to go to the party, the plan was that they were going to find out what Baumann was up to, and if he was up to no good, then they stated that they were going to "fuck him up," "take him," and "roll him." Cash also testified that "rolling" meant to take his money, drugs, and whatever he had on him.

Instead of going directly to the party, Baumann, Quintana, Grim, and Rodriguez went to the residence of Larry Kinkade, Jr., who allegedly owed Quintana some money. Grim testified that when they were driving to Kinkade's place, Quintana kept asking Grim to "scoot up" and to "get up" and to "move." Grim believed it was because she was sitting on Quintana's lap. Grim was later told by Quintana and Rodriguez that Quintana was passing a gun to Rodriguez.

When they arrived at Kinkade's residence, Rodriguez got out of the truck and then Quintana also got out and walked 20 to 30 feet away from it. Rodriguez got back in the truck for a second, then walked to the back of the truck. Baumann got out and asked, "[D]id you bring the beer?" Rodriguez said "no," and Baumann then stated something to the effect of "stupid fuckers" in response. At that time, Grim heard a "pop" and then Rodriguez jumped back into the truck. Rodriguez had shot Baumann. The State and the defense agree Rodriguez was the shooter. Quintana came back and asked, "[D]id you get the wallet?" Rodriguez then got out, got Baumann's wallet, and then got back into the truck and drove Quintana and Grim to the party. Grim started having anxiety attacks, and Quintana told Grim to forget about it or something was going to happen to her. Cash testified that at the party, Quintana took Cash into a backroom and said "we killed him," but Cash did not take him seriously.

At around 6 a.m. on Sunday, the party was winding down and Grim talked to Quintana and Rodriguez about what they should do with Baumann's truck. Grim suggested dumping it in a nearby lake. They all decided to leave the party, and Quintana told Cash and Miller to follow them. Rodriguez drove Baumann's truck, along with Quintana and Grim, to the lake. The truck was dumped into the lake, and Quintana, Grim, Rodriguez, Cash, and Miller all went back to Rodriguez' residence. Quintana told Grim that he had gotten $110 out of

Baumann's wallet, although he told Cash that there "wasn't shit in the wallet."

Grim testified that while at Rodriguez' house, it began to fill with smoke because everyone was in the kitchen burning Baumann's wallet in a pot. Tony Rodriguez testified that he was suspicious that Quintana and Rodriguez were involved in Baumann's death. Tony Rodriguez asked Rodriguez to step into his room and asked Rodriguez what was going on. Rodriguez said "we done it," then Rodriguez motioned with his hand, indicating that he had pulled the trigger. On that following Wednesday, Quintana and Rodriguez went over to Miller's house to dispose of the gun and also the clothes that Quintana and Rodriguez were wearing the night of the shooting. Miller then melted the gun down with his welder and burned the clothes. Quintana and Grim were arrested on January 28, 1999, after Baumann's body was discovered on January 24. Rodriguez was also arrested. Rodriguez was tried for first degree murder before Quintana's trial, and Rodriguez was acquitted.

Before trial, Quintana made a motion for a change of venue based on the publicity of the murder trial of Rodriguez and several newspaper articles which referred to Quintana's involvement in the murder of Baumann. Quintana argued that his refusal to testify in Rodriguez' trial, the fact that Rodriguez was acquitted, and the fact that Rodriguez' defense was that Quintana committed the murder meant that the public would believe Quintana must have committed the murder. The trial court stated that it believed Quintana's showing of publicity was not sufficient and stated that a showing that the publicity tainted the entire jury pool was also needed. The trial court, therefore, denied Quintana's request for change of venue and said that it would consider the subject again during actual jury selection. During the jury selection, Quintana renewed his motion for change of venue and the trial court overruled the motion.

During jury selection, Quintana asked to excuse prospective juror W.W. for cause. Juror W.W. had stated that he "kinda halfway" felt Quintana was guilty because of what he had read and heard about the case. Juror W.W. then agreed that Quintana was really innocent until proved guilty and that he would try to put aside the things he had read and heard about Quintana. The

trial court denied Quintana's request to strike juror W.W. for cause. Quintana, therefore, had to use one of his peremptory challenges to remove juror W.W. from the jury.

At trial during the direct examination of Grim by the State, Grim testified that immediately after Rodriguez had shot Baumann, Quintana asked Rodriguez, "[D]id you get the wallet?" After a series of questions about the sequence of events, the State asked, "And is it at that point that [Quintana] made his statement? What did he say?" Quintana objected as asked and answered, the trial judge overruled the objection, and Grim repeated the statement that Quintana had asked, "Did you get the wallet?" Quintana now argues that this is cumulative evidence. The State argues that the second question was asked to clarify when Quintana asked about the wallet in the sequence of events.

During the cross-examination of Cash, Cash was asked whether he had been arrested in July for making terroristic threats, which was after the crime in the present case. The State objected as to relevance, and the trial court sustained the objection. Quintana made an offer of proof and argued that the testimony was relevant because a pending criminal charge would go to Cash's bias or motive to cooperate with the State in his testimony. The trial court asked Cash if he had had any discussions with the county attorney's office, directly or through counsel, concerning any immunity or plea agreement, and Cash responded, "Nothing." The State renewed its objection to the offer of proof, and the trial court sustained the objection.

After the State rested its case, Quintana called Kinkade to the witness stand to testify. Baumann was shot near Kinkade's residence. Quintana's attorney propounded a series of questions to Kinkade about Kinkade's relationship with Quintana and about some money that Kinkade may have owed Quintana. On cross-examination, the State questioned Kinkade about the last time Quintana was at Kinkade's residence. Kinkade stated that the last time Quintana had been at his residence was "probably the night [Quintana] got out of prison." Quintana made a motion to strike the answer, and the trial court sustained the motion and asked the jury to disregard the last portion of Kinkade's answer.

After Quintana rested his case, he made a motion for a mistrial based on Kinkade's reference to prison, arguing that it

would be very hard for the jury to disregard the reference to prison. Kinkade never met with Quintana before trial to talk about his proposed testimony despite Quintana's several attempts to do so. The State responded that the admonishment by the trial court was sufficient. The trial court stated that although it was unfortunate that the witness would not cooperate in advance, Kinkade was a defense witness, and therefore the trial court overruled the motion for a mistrial. It should be noted that during jury selection and at points throughout the trial, references were made about Quintana's being in jail and his involvement in drug abuse and other illegal activities.

At both the end of the State's case and the end of Quintana's case, Quintana made motions to dismiss. Quintana argued that the State had failed to prove a prima facie case. Quintana claimed that the State failed to prove that Quintana had any knowledge about the robbery, that all statements indicating a plan to rob Baumann were ambiguous, and that Quintana's taking of Baumann's wallet was just an afterthought. Quintana also argued that the State failed to prove a prima facie case as to the use of a firearm to commit a felony charge. The trial court overruled both motions.

Quintana requested jury instructions regarding accomplice testimony pertaining to Grim, Cash, and Miller. Quintana wanted the jury instruction to mirror NJI2d Crim. 5.6. The instruction actually given to the jury states that Grim, Cash, and Miller were "accessories after the fact" and that "[y]ou should closely examine their testimony for any possible motive they might have to testify falsely." Quintana claimed that the instruction differs from NJI2d Crim. 5.6 in that it omits the following proposed language:

> You should hesitate to convict the defendant if you decide that Wendy Grim, Abie Cash or Stacie Miller testified falsely about an important matter and that there is no other evidence to support his or her testimony.
>
> In any event, you should convict the defendant only if the evidence satisfies you beyond a reasonable doubt of his guilt.

Quintana also requested a jury instruction regarding proximate cause. Quintana believed that an instruction should state

that the killing must have occurred "in a natural and continuous sequence." The defense that Quintana had offered was that taking the wallet was an afterthought and that the actual proximate cause of Baumann's death was Baumann's own derogatory comment to Rodriguez, angering Rodriguez to shoot Baumann. Quintana offered a proposed jury instruction similar to NJI2d Crim. 4.1 with an added section entitled "Efficient Intervening Cause." This added section had language taken from the case *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975). The State objected, and the trial court sustained the objection.

The case was submitted to a jury, and it returned a verdict of guilty of aiding and abetting first degree murder and guilty of aiding and abetting the use of a firearm to commit a felony. Quintana was convicted pursuant to the jury verdict.

## STANDARD OF REVIEW

■ In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999).

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999); *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998); *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998).

■ The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675 (1999).

■ A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. Strohl, supra*; *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

■ Whether jury instructions given by a trial court are correct is a question of law. *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000); *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

■ The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Bjorklund, supra*; *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999).

## ANALYSIS

### CONFRONTATION CLAUSE

We first address Quintana's contention that the trial court erred in restricting his cross-examination of Cash regarding the fact that prior to trial, Cash had been arrested for making terroristic threats but then released and, as of the date of trial, had not been prosecuted for the offense. Quintana argues that this restriction violated his rights under the Confrontation Clause of the Sixth Amendment and was prejudicial in that cross-examination on this subject would have permitted the jury to draw "an inference that Cash was aware that the prosecutor holds the keys to his future and consequently Cash was testifying in such a manner as to appease the Buffalo County Attorney's office and to continue to avoid prosecution." Brief for appellant at 32.

■ Quintana cites *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), in support of this argument. In that case, the defendant's attorney sought to impeach a prosecution witness during cross-examination by questioning the witness about a public drunkenness charge which had been dismissed in exchange for his agreement to speak with the prosecutor concerning the murder charge against the defendant. The trial court refused to permit this cross-examination. On appeal, the Delaware Supreme Court reversed based upon its determination that the restriction of cross-examination deprived the defendant of rights secured by the Confrontation Clause. *Van Arsdall v. State*, 486 A.2d 1 (Del. 1984). The U.S. Supreme Court agreed:

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400 (1965), "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315. Indeed, " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Id.*, at 315-316 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original). Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis, supra,* at 316-317 (citing *Green v. McElroy*, 360 U.S. 474, 496 (1959)).

*Delaware v. Van Arsdall*, 475 U.S. at 678-79. The Court concluded by stating "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." 475 U.S. at 679. Relying on *Van Arsdall* and the U.S. Supreme Court's subsequent decision in *Olden v. Kentucky*, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988), we have recognized that a violation of an accused's right of confrontation occurs when a defendant in a criminal case is prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness and thereby expose facts from which jurors could appropriately draw inferences relating to the reliability of the witness. *State v. Johnson*, 255 Neb. 865, 587 N.W.2d 546 (1998).

The circumstances of Cash's arrest for making terroristic threats and his subsequent release without being charged, all occurring shortly prior to his testimony at the trial of this case, were relevant to the issue of his credibility. As a component of his right to confront Cash by cross-examining him, Quintana was entitled to present these circumstances to the jury so that it

could decide whether Cash's testimony was biased by a personal desire to curry favor with law enforcement authorities regarding the offense for which he was arrested but not yet charged. Accordingly, we conclude that the trial court's refusal to permit cross-examination on this subject violated Quintana's rights under the Confrontation Clause and constituted error.

## HARMLESS ERROR

In *Delaware v. Van Arsdall, supra,* the Court held the "constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless error analysis." 475 U.S. at 684. The Court also articulated the test for harmless error to be applied in this circumstance, stating:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), citing *Harrington v. California,* 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969), and *Schneble v. Florida,* 405 U.S. 427, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972). The Court remanded the cause to the Delaware Supreme Court for determination of whether the error was harmless.

In assessing the "damaging potential" of the erroneously excluded cross-examination in the present case, we note that the facts are in some respects distinguishable from those in *Van Arsdall.* In that case, there was an agreement between the witness and the prosecution which resulted in the dismissal of the public drunkenness charge in exchange for the witness agreeing to speak to the prosecutor about the murder. In Quintana's offer

of proof, made outside the presence of the jury, Cash testified that he had no agreement with the State regarding any charges which might arise from his arrest for making terroristic threats. In addition, the offer of proof revealed that other persons who were arrested along with Cash but had no involvement in the present case were similarly released without being charged. Thus, while a jury could have drawn an inference of bias from the circumstances surrounding Cash's arrest and release, it could likewise have reasonably concluded that these events were completely unrelated to Cash's testimony in this case.

It is against this less than compelling "damaging potential" of the excluded cross-examination testimony that the other evidence of Quintana's guilt must be considered in our harmless error analysis. As Quintana points out, Cash was the only witness who used the term "rolling" with respect to the intent of Quintana and Rodriguez toward Baumann, defining it to mean robbery. However, even if Cash's testimony were disregarded, there is compelling evidence that Baumann was shot during the commission of a robbery which was planned by Quintana and Rodriguez. The testimony of Grim establishes that Quintana was angry with Baumann and believed that Baumann was a "narc." Grim stated that Quintana had robbed Baumann previously. Grim also testified that Quintana said that Baumann "was going to get fucked up." Although Grim stated that she did not know what this meant, she did state that she "knew something was going to happen." Grim likewise stated that Quintana wanted Grim to come with Baumann and Rodriguez so Baumann would not be suspicious or "think something's up." In addition, Tony Rodriguez testified that on the way to the motel, Quintana said that "[Baumann] had owed him some money, and he was going to get it." Tony Rodriguez also testified that he was suspicious that Quintana and Rodriguez were involved in Baumann's death. Tony Rodriguez asked Rodriguez to step into his room and asked Rodriguez what was going on. Rodriguez said "we done it," and then motioned with his hand, indicating that he had pulled the trigger. Most importantly, Grim testified that Quintana passed a handgun to Rodriguez just prior to the shooting and that immediately after the shooting, Quintana asked, "[D]id you get the wallet?" Based upon all of the properly

admitted evidence, we conclude that the error in restricting Quintana's cross-examination of Cash with respect to his arrest and release was harmless beyond a reasonable doubt.

### FAILURE OF TRIAL COURT TO DISMISS CASE

Quintana argues the evidence is insufficient as a matter of law to support the essential elements of the offense charged. Quintana asserts that there is no evidence in the record or reasonable inference from the evidence that establishes that he knew that Rodriguez intended to rob Baumann or that he performed some affirmative act to encourage the commission of the robbery. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999); *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998); *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998).

In reviewing the record, as was done in the above Confrontation Clause-harmless error analysis, we conclude that the record as a whole and the evidence contained in it, taken in the light most favorable to the State, were sufficient to sustain Quintana's conviction.

### PROSPECTIVE JUROR

Quintana assigns as error that he was prejudiced by the trial court's not striking potential juror W.W. for cause. Quintana argues that W.W.'s statements that he would "try" to issue an impartial verdict upon the law and evidence presented fall short of that which is statutorily required under Neb. Rev. Stat. § 29-2006 (Reissue 1995). Quintana concludes that because of the trial court's failure to strike juror W.W. for cause, he had to use one of his peremptory challenges to remove juror W.W. and was thus prejudiced.

Section 29-2006 provides, in relevant part:

The following shall be good causes for challenge to any person called as a juror or alternate juror, on the trial of any indictment: . . . (2) that he has formed or expressed an opin-

ion as to the guilt or innocence of the accused; PROVIDED, if a juror or alternate juror shall state that he has formed or expressed an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror or alternate juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments or reports, or upon rumor or hearsay, and not upon conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify, and the juror or alternate juror shall say on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that such juror or alternate juror is impartial and will render such verdict, may, in its discretion, admit such juror or alternate juror as competent to serve in such case . . . .

The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675 (1999); *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999).

The true object of challenges, either peremptory or for cause, is to enable the parties to avoid disqualified persons and secure an impartial jury. When that end is accomplished, there can be no just ground for complaint against the rulings of the court as to the competency of the jurors. *State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983); *Bufford v. State*, 148 Neb. 38, 26 N.W.2d 383 (1947). Furthermore, where a party has not exhausted his or her peremptory challenges, it must be assumed that the party was satisfied that the jurors empaneled were fair and impartial. See *State v. Rife, supra*. Even where a party's peremptory challenges are exhausted, the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges. See *Bufford v. State, supra*. See, also, *Nichols v. State*, 109 Neb. 335, 191 N.W. 333 (1922); *Kennison v. State*, 83 Neb. 391, 119 N.W. 768 (1909).

Quintana does not specifically argue that he would have used his peremptory challenge on another biased juror but for being forced to use it on juror W.W. The record does not establish that Quintana even used all of his peremptory challenges. The burden is on Quintana to provide these facts and to present a record to substantiate his argument that he was prejudiced. It is incumbent upon the appellant to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *State v. Williams*, 253 Neb. 619, 573 N.W.2d 106 (1997); *State v. Price*, 252 Neb. 365, 562 N.W.2d 340 (1997).

The record does not establish that Quintana exhausted his peremptory challenges or that a biased juror sat on the jury as a result of any error on the part of the trial court. We further note that although Quintana's appellate argument is premised entirely on § 29-2006 and that he has not presented a claim under the Due Process Clause, the U.S. Supreme Court has set forth standards with regard to the overruling of challenges for cause that are coextensive with those provided by Nebraska law. See *United States v. Martinez-Salazar*, 528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000) (holding that if defendant elects to cure error in overruling of challenge for cause by exercising peremptory challenge, and is subsequently convicted by jury on which no biased juror sat, defendant has not been deprived of constitutional right).

Consequently, we need not determine if the trial court abused its discretion in overruling Quintana's challenge to juror W.W., as Quintana has not shown that the error he alleges was prejudicial. Quintana's assignment of error is without merit.

### FAILURE TO GRANT CHANGE OF VENUE

Quintana asserts as error the trial court's refusal to grant his motion for a change of venue based on the publicity of the murder trial of Rodriguez and several newspaper articles which referred to Quintana's involvement in the murder of Baumann. Quintana argues that the fact that Rodriguez was acquitted, and Rodriguez' defense was that Quintana committed the murder, meant that the public would believe Quintana must have committed the murder. Quintana further argues that "[a]ny reasonable

juror on this panel would have known that an acquittal of Quintana would have meant that no one would be prosecuted and convicted for the murder of Baumann." Brief for appellant at 38.

A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675 (1999); *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). The law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based on evidence presented in court. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Strohl, supra*; *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999).

The record shows that several of the prospective jurors had heard something about the case from a variety of sources. The trial court asked, "So what we're asking you is not really have you heard something but is there anything that you feel or are you at a point that you can't set aside that information and start all over and base your decisions in this case upon what you hear in court." Two jurors were excused for cause by the trial court because they could not set aside information that they knew of and just base their decisions from what they heard in court. Quintana also believed juror W.W. could not set aside information that he knew about and also that he could not base his decisions solely on the evidence presented to him in court. Therefore, Quintana used one of his peremptory challenges to remove juror W.W. from the jury. There is no indication in the record that Quintana used any more of his peremptory challenges on prospective jurors, believing that they could not meet the juror standard set forth above.

The remaining jurors agreed that they could set aside any information that they knew about the case and that they would make decisions solely from what they heard in court, which facts render them as acceptable to sit on Quintana's jury. Because the jurors averred that they could act fairly and impartially, we conclude that Quintana has not shown that he could not receive a fair trial in Buffalo County. See, e.g., *State v.*

*Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993); *State v. Goham*, 187 Neb. 34, 187 N.W.2d 305 (1971). As such, we conclude that the trial court did not abuse its discretion in denying Quintana's motion for a change of venue.

### FAILURE TO PROPERLY INSTRUCT JURY REGARDING ESSENTIAL ELEMENT OF PROXIMATE CAUSE

[15] Quintana assigns as error the trial court's refusal to give Quintana's proposed instruction on proximate cause. Quintana argues in his brief that there was a question of fact as to whether the shooting was a result of the robbery attempt or some other independent reason. Whether jury instructions given by a trial court are correct is a question of law. *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000); *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000); *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000); *State v. Bjorklund, supra.* To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Garner, supra*; *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419 (1999).

Quintana relies upon the testimony of Cash and Grim, both of whom testified that Baumann had called Rodriguez and the others "stupid fuckers" immediately before the shooting. Grim testified that Rodriguez later told her that Rodriguez had thought Baumann's remark was a racial slur toward Mexicans and that Baumann was shot because Rodriguez was angered by the remark. Quintana's argument, in short, is that Baumann's comment was an "efficient intervening cause" that severed the causal connection between any plan to rob Baumann and the shooting.

Quintana's proposed instruction stated:

### A. "Proximate Cause"

The defendant's aiding and abetting Jaime Rodriguez in perpetrating a robbery of Roger Baumann caused the death of Roger Baumann if Roger Baumann's death occurred in a natural and continuous sequence, and without the defendant's act Roger Baumann's death would not have

occurred. Proximate cause is, a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred.

## B. "Concurring Cause"

Where the independent acts of more than one person combine to proximately cause the same injury, each such act is a proximate cause, and each such person may be held responsible for causing the result.

NJI 2d Crim. 4.1 (with minor revision)

## C. "Efficient Intervening Cause"

An efficient intervening cause is a new and independent act, itself a proximate cause of death, which breaks the causal connection between the original illegal act and the death. *State v Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975).

In order to find the defendant guilty of felony murder, you must find beyond a reasonable doubt that the robbery was the proximate cause of Roger Baumann's death. If you do not so find or if you find that Roger Baumann's death was caused by an efficient intervening cause, then you must find the defendant not guilty.

In *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975), upon which Quintana's proposed instruction was based, the defendant was found guilty of felony murder after allegedly killing the victim in the attempted perpetration of a robbery. The victim, an elderly woman, had resisted when the defendant and his accomplice attempted to snatch the woman's purse. *Id.* The victim fell to the ground and was kicked by her assailants, and she suffered a broken hip, either from the fall or the blows inflicted by her assailants. *Id.* The victim was hospitalized for treatment, and surgery was performed, but the victim died approximately 6 weeks after the assault, without having been released from the hospital. *Id.*

The defendant argued and also adduced medical testimony to the effect that the victim's death was not caused by the acts of her assailants, but was the result of intervening events, including a myocardial infarction and an unrelated infection. *Id.* This court concluded that the jury in that case had been properly instructed that an efficient intervening cause is a new and independent act, itself a proximate cause of the death, that broke the

causal connection between the original illegal act and the death. *Id.* See, also, *State v. Dixon,* 222 Neb. 787, 387 N.W.2d 682 (1986) (holding that heart attack caused by felonious conduct establishes necessary causal connection for felony murder); *State v. Lytle,* 194 Neb. 353, 231 N.W.2d 681 (1975) (stating identical rule in appeal from conviction of *Harris* defendant's accomplice).

We discussed *State v. Harris, supra,* in *State v. Ruyle,* 234 Neb. 760, 452 N.W.2d 734 (1990). In that case, the defendant was accused of lighting a fire at an apartment building that resulted in the death of one of the building's residents. The defendant argued that the victim caused his own death by voluntarily reentering the building after he was safe and that his contributory negligence was an efficient intervening cause which broke the causal connection between the original illegal act and the death of the victim. *Id.* We concluded otherwise, holding that the victim's contributory negligence would not relieve the defendant from criminal responsibility for the homicide unless it was a supervening, and thus sole, cause of the death. *Id.*

Our holdings in *State v. Harris, supra,* and subsequent cases indicate that the instruction proffered by Quintana was a correct statement of the law. It is evident, however, that the instruction was not warranted by the evidence in the instant case. The argument made by Quintana relates not to the cause of Baumann's death, but to whether the shooting occurred during the course of a robbery.

An instruction on proximate cause, pursuant to *State v. Harris, supra,* is appropriate where the evidence presents a jury question as to whether the death of the victim was proximately caused by an act of the defendant or the defendant's accomplice. In this case, there is no dispute that the proximate cause of Baumann's death was that Baumann was shot by Rodriguez. The immediate reason for Rodriguez to shoot Baumann does not affect the fact that the shooting was the cause of Baumann's death. The question for the jury was instead whether the shooting occurred during the course of a robbery.

In *State v. Perkins,* 219 Neb. 491, 364 N.W.2d 20 (1985), the defendant argued that the jury instructions as given were erroneous because they did not require there to be a causal connec-

tion between the robbery and murder for felony murder to occur. The jury had been instructed:

> "A defendant who is engaged in the perpetration of a robbery or attempted robbery who has knowledge that another has actively joined in such defendant's criminal enterprise and who continues to participate in the robbery or attempted robbery in any degree cannot escape responsibility for a homicide which occurs during the course of the robbery or attempted robbery because as a result either of fear or even of a better motive he concludes to desist from further participation or flee prior to the consummation of the robbery or attempted robbery."

*Id.* at 499, 364 N.W.2d at 26. The defendant argued that this instruction did not clearly require that the murder had occurred in the course of the crime. This court stated:

> Instruction No. 10 as written was sufficient to establish that the murder must flow from the course of the robbery. Any concern that it did not adequately express that the murder must occur during the res gestae of the robbery is dispelled by instruction No. 12, which provided in part:
>
> "You are instructed that in order to establish that a homicide was committed in the perpetration of or attempt to perpetrate a robbery it is not necessary for the State to prove that the homicide was committed before or during the actual perpetration of or attempted perpetration of a robbery; *a homicide is committed in the perpetration of or attempt to perpetrate a robbery if it is committed in the res gestae of the perpetration of or attempted perpetration of a robbery; that is, if the initial crime of perpetration or of attempt to perpetrate a robbery and the homicide were closely connected in point of time, place and causal relation, and were parts of one continuous transaction.*" . . .
>
> When read together, the instructions given fairly stated the elements of felony murder.

(Emphasis in original.) *Id.* at 500, 364 N.W.2d at 26-27.

Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is not prejudicial error. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000); *State v. Brown*, 258 Neb. 346, 603 N.W.2d 456

(1999). The jury instructions given in this case required the jury to find, as an element of the offense, that Baumann was killed during the course of Rodriguez' robbery of or attempt to rob Baumann. Instruction No. 14 as given in pertinent part states:

A death occurs while in the course of committing or attempting to commit a robbery if the act that killed *is closely connected in time and place with the robbery or attempted robbery* so that the act that killed and the *robbery or attempted robbery may be considered one continuous event.*

*If the intent to rob is formed prior to or contemporaneously with the act that results in death, then the death occurs in the course of the commission of the robbery or attempted robbery.*

If the taking of the property was an after thought then the killing is not in the commission of a robbery or an attempted robbery and you should find the defendant not guilty of aiding and abetting first degree murder.

(Emphasis supplied.)

The jury in this case was properly instructed, pursuant to *State v. Perkins, supra,* that in order for Quintana to be found guilty of felony murder, the shooting must have occurred in the course of a robbery. Quintana was free to argue to the jury that there was no plan to rob Baumann, but that the shooting was incited by Baumann's alleged racial slur. Given the evidence regarding a plan to rob Baumann, if believed, the evidence would permit the jury to find Quintana guilty of aiding and abetting felony murder, however, even if the shooting was prompted by Baumann's remark.

Causation, in the context of felony murder, requires that the death of the victim result from an act of the defendant or the defendant's accomplice. The question of why Rodriguez shot Baumann does not address whether the shooting caused Baumann's death, and there is no dispute that it did. Because there was no dispute as to proximate cause, Quintana was not entitled to his proffered proximate cause instruction. A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record. *State v. Urbano,* 256 Neb. 194, 589 N.W.2d 144 (1999). Instead, the presence of a

possible alternative motive for the shooting relates to whether or not the shooting took place in the course of a robbery, and the jury was properly instructed on that issue. In reading instruction No. 14 along with the rest of the jury instructions, we determine that the instructions given are a correct statement of the law regarding felony murder and that Quintana has not met his burden of establishing reversible error.

### INSTRUCTION AS TO ACCOMPLICE TESTIMONY

Quintana requested an instruction based on NJI2d Crim. 5.6 regarding accomplice testimony of Grim, Cash, and Miller. The request was denied, and the jury was given instruction No. 10, which stated as follows:

> There has been some evidence offered that Wendy Grim, Stacie Miller, Abie Cash and Ed Corder were accessories after the fact to the charge for which the defendant has been charged in that these individuals may have concealed or destroyed evidence or assisted the defendant in concealing and destroying evidence of the crime. You should closely examine their testimony for any possible motive they might have to testify falsely.

NJI2d Crim. 5.6 provides:

> There has been testimony from (here insert name), a claimed accomplice of the defendant. You should closely examine (his, her) testimony for any possible motive (he, she) might have to testify falsely. [You should hesitate to convict the defendant if you decide that (here insert name) testified falsely about an important matter and that there is no other evidence to support (his, her) testimony.
>
> In any event, you should convict the defendant only if the evidence satisfies you beyond a reasonable doubt of (his, her) guilt.]

In Quintana's case, Grim and Miller were not accomplices, although they were arguably accessories after the fact in that they participated in disposing of Baumann's truck, burning Baumann's wallet, and melting down the gun Rodriguez had used to shoot Baumann. Cash, because he testified that he was aware of the plan to rob Baumann, was arguably an accomplice to the crime.

██ It is the rule in this state that a defendant is entitled to a cautionary instruction on the weight and credibility to be given to the testimony of an accomplice, and the failure to give such an instruction is reversible error. *Jungclaus v. State*, 170 Neb. 704, 104 N.W.2d 327 (1960). In this case, instruction No. 10 properly instructed the jury to consider the credibility and weight to be given to the testimony presented. In addition, instruction No. 12 instructed the jury that the State was required to prove each and every element of the offense charged beyond a reasonable doubt and that otherwise the jury was to find Quintana not guilty.

██ In considering the instructions as a whole, see *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000), we conclude that the substance of Quintana's proposed instruction was presented to the jury. It is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997), *disapproved on other grounds, State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999); *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995).

We conclude that Quintana's assignment of error that the trial court erred in failing to properly instruct the jury regarding the essential element of proximate cause and the further assignment of error that the trial court erred in failing to properly instruct the jury regarding accomplice testimony are without merit.

### FAILURE TO GRANT MISTRIAL

Quintana next asserts error in the trial court's refusal to grant a mistrial because of remarks made by a defense witness. Kinkade remarked that he "saw [Quintana] at — probably the night he got out of prison." There was a motion to strike, which the trial court sustained as to "probably the night he got out of prison" and asked the jury to disregard it. In instruction No. 3, the jury was told that anything the trial judge told the jury to disregard was not evidence. Quintana argues that the unexpected reference to prison, while not intentional on the part of the prosecution, resulted in the jury's receiving improper and unduly prejudicial evidence which would be difficult if not impossible to erase from the jurors' minds.

█ The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999). Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999); *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993), *overruled on other grounds, State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999).

The record reveals six other references regarding Quintana's being in jail in addition to the prison comment made by Kinkade. No objection was raised to these other references to Quintana's incarceration, and some of that testimony was adduced by Quintana. We note also that references are made in the record about Quintana's previously robbing Baumann and being involved in drug abuse and other illegal activities. In light of these references to Quintana's being in jail and being involved in other illegal activities, we conclude that the prison comment did not prejudice Quintana to the point where he did not have a fair trial.

█ Ordinarily, when an objection to or motion to strike improper evidence is sustained and the jury is instructed to disregard it, such instruction is deemed sufficient to prevent prejudice. *State v. Lotter, supra.* We determine that the trial court did not abuse its discretion in denying Quintana's motion to grant a mistrial. The trial court's instruction to the jury to disregard the improper remark was sufficient to prevent prejudice to Quintana in the light of all the evidence.

## PERMITTING CUMULATIVE TESTIMONY

█ Quintana's final assignment of error concerns the trial court's admission of cumulative testimony. At trial during the direct examination of Grim by the State, Grim testified about the events immediately after the shooting of Baumann and stated

that after Rodriguez had shot Baumann, Quintana asked him, "[D]id you get the wallet?" Subsequently, after a series of questions about the sequence of events, the State asked, "And is it at that point that [Quintana] made his statement? What did he say?" Quintana objected as asked and answered, and the trial court overruled the objection. Even if this question was asked and answered (cumulative), erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998); *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997).

Quintana also argues that the cumulative admission of this testimony violated Neb. Rev. Stat. § 27-403 (Reissue 1995). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. § 27-403. In this case, the State claimed that the testimony was repeated in order to clarify the sequence of events to which the witness was testifying. Given that explanation, we cannot conclude that the probative value of the testimony was substantially outweighed by the cumulative nature of the testimony.

We conclude that the cumulative testimony presented did not violate § 27-403 and that the error in admitting this testimony, if any, was harmless beyond a reasonable doubt. Thus, Quintana's assignment of error is without merit.

## CONCLUSION

For the reasons outlined in the above opinion, we conclude that Quintana's assignments of error are either without merit or constitute harmless error. For these reasons, we determine that the judgments of the trial court convicting Quintana of first degree murder and aiding and abetting the use of a firearm to commit a felony should be, and are, affirmed.

AFFIRMED.