IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. REED

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

WILLIAM REED, APPELLANT.

Filed June 5, 2018.    No. A-17-416.

Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

INTRODUCTION

William Reed was convicted by a jury of second degree murder and use of a deadly weapon to commit a felony. The district court for Scotts Bluff County subsequently sentenced Reed to imprisonment for a period of not less than 40 years nor more than life for the second degree murder conviction and for a period of 10 to 20 years for the deadly weapon conviction, to be served consecutively. On appeal, Reed argues the district court erred in receiving the entirety of a video recording of Reed's arrest, transport, and visit to a hospital emergency room into evidence. Reed additionally argues that there was insufficient evidence to support his conviction for second degree murder. For the reasons set forth below, we affirm.

BACKGROUND

The State filed an information charging Reed with second degree murder pursuant to Neb. Rev. Stat. § 28-304 (Reissue 2016) and with use of a deadly weapon to commit a felony pursuant to Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016). The charges against Reed stem from an incident which occurred on April 22, 2016, wherein Reed allegedly stabbed his brother, Christopher Reed (Christopher), in the upper torso causing his death.

Trial commenced on February 27, 2017. The evidence adduced at trial consisted of testimony from police officers, investigators, a forensic pathologist, a DNA expert, neighbors, Reed's mother, and Reed himself. The State also presented evidence from a surveillance camera at a liquor store, an audio recording of Reed's interview with police, and body camera footage from an officer arriving at the scene of the incident. Reed's only assigned error with regard to the admission of evidence is that the district court allowed the entirety of the body camera footage to be shown to the jury.

Officer William Howton of the Scottsbluff Police Department was one of the initial responders to a 911 call placed on April 22, 2016. Howton first came upon Reed in the backyard of Christopher's home. Reed was moving around, falling down to the ground, and flailing uncontrollably. Howton placed Reed in handcuffs and transported him to a nearby hospital. We will discuss the body camera footage in greater detail in our analysis. Generally however, Reed exhibited agitated behavior in the body camera video. He commented multiple times that he had killed his brother and that his brother wanted to die. Reed also asked the officers to kill him. Later in the video Reed also iterated racial slurs against his former stepfather. Howton transported Reed to the hospital due to lacerations on Reed's arms.

Officer Corey Fuller also responded to the 911 call to Christopher's home. Fuller entered the home for a victim check and came upon the body of Christopher. Fuller noted broken glass, blood on the floor and on the kitchen walls, and a knife near Christopher. A 1.75-liter bottle of alcohol was recovered at the scene. The bottle was approximately half-full. A clerk from the liquor store testified that Reed and Christopher had purchased the bottle the day of the incident.

Two of Christopher's neighbors testified at trial. They both testified that they heard Reed yelling that he had killed his brother. One of the neighbors called 911 because he heard glass breaking and Reed yelling. The other neighbor testified that he was outside and Reed came up to him yelling that he had killed his brother. Reed then threw himself down on the cement and asked the neighbor to help him.

Dr. Peter Schilke, a forensic pathologist, testified that he performed the autopsy on Christopher. Dr. Schilke determined that Christopher died as a result of a stab wound above the left clavicle. The sharp-forced injury incised his carotid artery and penetrated the upper left lobe of Christopher's lung. This wound resulted in a large amount of blood being pumped into Christopher's chest cavity and out as well. Dr. Schilke testified that Christopher had a blood alcohol level of .267, but that his liver did not reveal any evidence of hepatitis or disease associated with alcoholism. Dr. Schilke also noted that Christopher had a large number of other sharp forced injuries that appeared to have been sustained at or near the time of the fatal wound. These included cuts of up to seven and one half inches in length and additional stab wounds. Christopher's body also exhibited numerous contusions and abrasions. While numerous, none of the additional

wounds were listed as contributing to the cause of death. Several photographs depicting Christopher's wounds were received into evidence without objection.

Investigator Brandi Brunz of the Scottsbluff Police Department was assigned as the primary investigating officer in the case. She testified that she made diagrams of the scene and took photographs. Brunz also collected blood samples and sent them to the University of Nebraska Medical Center Laboratory for DNA analysis. Brunz interviewed Reed the day after the incident. She made an audio recording of the interview, which was received into evidence and played for the jury.

Reed was informed of his *Miranda* rights and agreed to participate in an interview. During the interview, Reed told Brunz that "[Christopher] wanted to die and I was drunk" and that "[Christopher] said he wanted to die and then I freaking did it." Reed stated that "obviously there was one freaking swing." He also said that "the obvious thing happened because I fucking decided to do what I did." Reed stated that he and Christopher were having a good time prior to the incident and that no struggle or fight precipitated his actions. He denied having any memory of picking up the knife and attacking Christopher. He did recall observing gurgling on Christopher's body and trying to perform CPR. He also recalled running into the yard and telling the neighbors that he had killed his brother.

Patricia Deffebaugh, the mother of Reed and Christopher testified during Reed's case. Deffebaugh stated there were times when Christopher would not take his medication, and that there would be times when he would have a good attitude and other times when he would be down and depressed. Deffebaugh also testified that Christopher had started drinking alcohol, and that she would notice empty alcohol and beer bottles around his home. A few days before the incident occurred, Deffebaugh drove Reed from Alliance to Scottsbluff to stay with Christopher. Throughout the next few days, Deffebaugh kept in touch with Christopher via phone calls and text messages, and did not get a sense that there were any problems between Christopher and Reed. The day before the incident, Christopher asked Deffebaugh for some money, and she agreed to put money into his account, which she did the morning of the incident. Deffebaugh communicated with Christopher the day of the incident and did not have any concerns that there were problems. Deffebaugh testified that Christopher and Reed had occasional conflicts but were close. She said that Christopher volunteered to have Reed come and stay with him.

Reed testified on his own behalf. The morning of April 22, 2016, Reed had an appointment at the workforce development office to help him look for jobs. Reed and Christopher met at about noon, went to McDonald's to eat, and then went to the liquor store. The two returned to Christopher's home and began drinking. Reed stated he was drinking whiskey mixed with water but that Christopher was drinking straight whiskey. Reed stated they were talking and eventually put on music. Christopher was drawing. Reed claimed to not remember anything associated with using a knife or the actual attack until Christopher was in mid-fall, hitting the ground, and Reed was on top of him. Reed stated Christopher gasped before hitting the ground, then his eyes closed and he gurgled. Reed hit Christopher in the face and hit him in the chest and gave him rescue breaths to try and revive him, but he was already dead. Reed went into the bathroom and punched the mirror. Then he ran outside, saw one of the neighbors and told him that he had killed his brother and to call 911. Reed ran back inside and gave Christopher two more rescue breaths, but he was

already dead. Reed went back outside and elbowed the window in the back of the home on his way out.

Reed claimed he remembered being hysterical and the handcuffs being put on, but then recalled nothing else until the next day when he woke up at the jail. Reed acknowledged that he had told investigators that Christopher told him he wanted to die, but testified that he actually had no recollection of Christopher saying that. He also claimed that when he told investigators that all he remembered was one swing, he did not actually remember taking a swing at Christopher, and that he was just "attributing" to how the death had occurred. On cross-examination Reed testified there was no struggle, fight, or argument between himself and Christopher. Reed stated that when he said that Christopher wanted to die and that he did it, he was again "attributing" what must have happened.

After deliberation, the jury found Reed guilty of second degree murder and use of a deadly weapon to commit a felony. The district court accepted the jury's findings, and found Reed guilty of the charges. Reed appeals.

## ASSIGNMENTS OF ERROR

Reed argues the district court erred in allowing the entirety of the body camera video taken by Officer Howton to be shown to the jury. Reed additionally argues that there was insufficient evidence to support his conviction for second degree murder.

## STANDARD OF REVIEW

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016).

## ANALYSIS

### BODY CAMERA FOOTAGE

Reed argues that the district court erred in allowing the entirety of Officer Howton's body camera video, which was 30 minutes in duration, to be played for the jury. He asserts that the first 10 minutes of the video was admissible, but the remaining footage was unfairly prejudicial and cumulative. He notes that the video shows him making threats toward officers and hospital staff, and that he makes comments about his former stepfather that were racially provocative. Reed claims there was no need to present this to the jury except to inflame their passions against him to the extent that they would not consider any verdict other than guilty of second degree murder. We note that at trial, Reed initially objected only to the portion of the video which occurred at the hospital. However, during argument of the objection, he expanded its scope to include the period of transport to the hospital. The nature of the objection was similar to what is argued on appeal,

that being relevance along with the additional video being cumulative and unfairly prejudicial. Therefore, our analysis will address both the period of transport and the hospital portions of the video.

The first portion of the video depicts Reed's initial contact with officers, being placed into handcuffs and restrained, answering a few questions regarding his name, date of birth, and address, being asked and assisted to get up, walking a few steps and dropping to the ground, getting back up and walking toward the patrol vehicle, and his transport to the hospital. It also shows some resistance on the part of Reed while being placed in the patrol vehicle. Once in the patrol vehicle Reed begins hitting his head against the cage while yelling and crying until Officer Howton begins to drive toward the hospital. From the beginning of the video until the arrival at the hospital Reed states no less than 15 times that he killed his brother following his brother's request to be killed. Reed makes comments that it was not his fault, that it was not his brother's fault, and that he was drunk. He repeatedly requested that the responding officers kill him. He also made repeated threats that he was going to kill Howton. Reed's demeanor during this period of time consists of short periods of being calm and cooperative with officers followed by periods of angry outbursts and agitation. Interspersed throughout are periods of crying and periods wherein Reed attempts to harm himself by banging his head against the cage in the patrol car. The jury was able to see the blood on Reed's hands, his blood soaked socks, blood on his face and shoulder, and grass in his beard from being on the ground. On one occasion in the patrol car, Reed makes a racially disparaging remark about his former stepfather, an African American.

At the hospital Reed's behavior continued in much the same manner. He repeatedly admits that he killed his brother and that his brother asked him to do so. The video shows Reed being carried into the hospital and held down on the floor of the triage room for several minutes. A nurse can be seen administering a shot to Reed, now wearing a spit mask, after which he is taken into one of the treatment rooms. Reed makes additional threats to kill the law enforcement officers present as well as the emergency room physician. He again makes racially disparaging remarks about his stepfather.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). The admission of photographs rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *Id.* Admission of videotapes is also generally within the trial court's discretion, subject to the same requirements for admission of still photographs. See *State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. See *State v. Freemont, supra*.

Neb. Rev. Stat. § 27-403 (Reissue 2016) provides, in part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." In the context of this section, "unfair prejudice" means an undue tendency to suggest a decision based on an improper basis. See *State v. Freemont, supra*. The district court overruled Reed's objection without iterating its specific rationale. We note from the record that the district court was displeased with Reed's attempt to raise his objection to the hospital portion

of the video for the first time at the time of its offer into evidence at trial. The court reminded counsel that two pretrial hearings had been held prior to trial wherein the issue could have been raised with ample time for the court to review the video. Reed now argues that despite his failure to raise his objection on a pretrial basis, the district court should have reviewed the video prior to ruling and bringing the jury back into the courtroom. We find that it is unnecessary to address whether the court should have viewed the video prior to proceeding with the jury in place. We find that the court did not abuse its discretion in admitting the entirety of the video.

Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. See *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994). However, it is only evidence that is "unfairly prejudicial" that should not be admitted into evidence.

The primary issue in this case was whether the State could prove that Reed intended to kill his brother. At trial Reed testified that he had no memory of the immediate events that led up to his brother being stabbed and killed. He recalled the pleasant events that occurred earlier in the day, but then has no memory of grabbing the knife, no memory of Christopher asking to be killed, and no memory of any fight or altercation. His first post-assault memory was falling on top of his brother, observing his brother gurgling, then attempting to revive him. He did recall going outside two times, informing his neighbor what happened and requesting him to call 911. However, he testified that once he flopped down on the ground he had no further memory of what happened for the remainder of that day. When asked if he intentionally killed his brother, he testified: "I did not--that I knew of." Reed also testified about his difficult childhood including the abuse he suffered from his former stepfather who he identified as being African American, and his own past abuse of alcohol and drugs. His mother testified about the positive relationship Reed had with Christopher.

Given that the issue in this case centered on intent to kill, we find that Reed's statements made in the immediate aftermath of Christopher's death are highly probative. While we recognize that playing the entirety of the body camera footage was repetitive to some extent, it portrays Reed's statements and behaviors moments after causing his brother's death. While Reed did iterate one racial slur in the patrol vehicle and two more at the hospital, they are brief and somewhat difficult to discern. They occur within the context of a recording that is replete with Reed's admissions of what he did to his brother. Given this context, we cannot find that the district court abused its discretion in receiving the entirety of the video into evidence. It was relevant and not unfairly prejudicial or cumulative.

SUFFICIENCY OF EVIDENCE

Reed argues that there was insufficient evidence to support a conviction for second degree murder. He does not argue that there was insufficient evidence to convict him of use of a deadly weapon to commit a felony. Reed asserts that the State failed to prove the element of intent in the trial because the only direct evidence used to satisfy this element against Reed was his own testimony.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of

witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed in a light most favorable to the State, is sufficient to support the conviction. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

Reed essentially argues that due to the lack of injuries to Christopher and the relatively normal condition of the home that there was no struggle between Reed and Christopher and that the killing was very sudden. He argues that there was not enough time to form the requisite intent for second degree murder. Reed argues that his statements were based on what he had assumed had happened because he does not remember the events of that day.

Based on the evidence detailed above, and viewing it in the light most favorable to the prosecution, we find that a rational trier of fact could find Reed guilty of second degree murder. Reed stated that he killed Christopher after Christopher told him he wanted to die. This statement was made by Reed both in the immediate aftermath of Christopher's death and in the interview the following day. We note that the State was not required to prove malice or premeditation, but only that Reed's act was committed intentionally. *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). We further note that the autopsy results support the jury's finding that Reed acted with intent. The photographs and accompanying testimony of Dr. Schilke demonstrates that Christopher suffered numerous wounds from a bladed instrument including several large slashes and other stab wounds. He also had a number of lacerations and abrasions. This evidence is highly corroborative of an intent to kill. As a result, we find that sufficient evidence existed for the jury to conclude that Reed intentionally, but without premeditation, intended to kill his brother.

## CONCLUSION

We find the district court did not err in allowing the entirety of body camera footage to be played to the jury. Additionally, we find there was sufficient evidence to support his conviction for second degree murder

AFFIRMED.